THOMPSON v. CONSOLIDATED GAS ELECTRIC LIGHT & POWER CO. OF BALTIMORE (two cases).

The GALLANT LADY.

THOMPSON v. UNITED STATES (Consolidated Gas Electric Light & Power Co. of Baltimore, third-party defendant) (two cases).

Adm. Nos. 3446 and 3472.
Civ. A. Nos. 5734 and 5886.
No. 3446.

United States District Court
D. Maryland.
March 18, 1953.

Geo. W. P. Whip, Baltimore, Md., Lord, Whip & Coughlan, Baltimore, Md., for Thompson in Adm. No. 3446 and Civ. A. No. 5734.

W. T. Taymans, Benj. Chambers, Wm. Baxter and Jas. A. Biddison, Jr., Baltimore, Md., for Consolidated Gas Electric Light & Power Co., in all four cases.

Bernard J. Flynn, U. S. Atty., William T. Foley, Jr., Atty. Dept. of Justice, Washington, D. C., and James B. Murphy, Asst. U. S. Atty., Baltimore, Md., for the United States in Civ. A. Nos. 5734 and 5886.

Sol. C. Berenholtz, Solomon Kaplan and Herbert H. Miller, Baltimore, Md., Miller & Putterman, Baltimore, Md., for Thompson in Adm. No. 3472 and Civ. A. No. 5886.

CHESNUT, District Judge.

These four cases were consolidated for trial as they all involve the same set of facts. They are all non-jury cases and were tried for seven days in January and February of this year. They arose out of an unusual occurrence. On July 7, 1951 at 12:32 P.M., standard time, the pleasure yacht "Gallant Lady", owned and navigated by Edmund Thompson, Sr., (plaintiff-libellant in these cases, hereafter for convenience called the plaintiff), received a discharge of electricity which damaged the yacht to some extent and is also alleged by the plaintiff to have caused him personal injuries. The electric discharge came from a high voltage cable spanning the Bush River about 400 feet south of the Pennsylvania Railroad Bascule Drawbridge over the River which is an estuary of the Chesapeake Bay and is navigable for boats with a small draft.

The yacht was a 53 foot twin-screw Diesel powered vessel of 13 foot beam and 3 foot draft. The plaintiff had bought the vessel from the Government some five years previously for about $5,000 and says he spent more than $20,000 in improvements. He has made several inter-coastal trips from Maryland to Florida in this yacht. It was equipped with a ship to shore telephone, the aerial of which consisted of a bamboo pole tapering from the base to the top where it had a three-sixteenths inch diameter. It was spirally wrapped with 90 feet of 14-gauge copper wiring. The height of this aerial or mast above the water was in dispute. The plaintiff contends that it was not more than 32′ 2″; the defendants contend that it was more than 34′. On government charts published by the United States Coast and Geodetic Survey, and other information to navigators, the clearance of the cable above "mean high water" was shown to be 34′. Whether or not the mast came into actual contact with the cable is also in dispute on the evidence. The plaintiff as a witness said that he did not know. The uncontradicted scientific evidence is that an electric discharge would not have jumped or arced more than six inches from the cable to a grounded object, such as the yacht's mast.

The admiralty suits are both against the Gas and Electric Company as the sole defendant. The civil actions are against the United States under the Federal Tort Claims Act. In one of the admiralty cases and in one of the civil actions damages to the yacht alone were alleged; in the other admiralty case and the other civil action personal injuries were alleged to the plaintiff. The explanation seems to be that the separate sets of suits were filed by different counsel, one representing the fire underwriters who, it is said, have paid a claim for fire damages to the yacht, and the other counsel representing the plaintiff individually.

The trial covered a wide variety of subject matters including expert evidence as to the building of the cable which is a part of a larger transmission line for electric power, navigation charts issued by the United States Coast and Geodetic Survey, records of tide in the Bush River, surveying data with regard to the clearance of the cable above mean high water, and contradictory evidence as to the height of the aerial mast on the yacht and the personal condition of the plaintiff. About thirty witnesses in all were examined in open court. The result of the trial in view of the number of separate cases and of the contradictory evidence and opposing contentions as to the applicable law in the admiralty and civil actions respectively, resulted in leaving a very confused picture both as to the facts and the law at the conclusion of the trial. However, since then I have had the advantage of at least four well prepared briefs by counsel for the parties and have carefully examined the numerous exhibits filed and reviewed the pertinent authorities. I think it will contribute to a better understanding of the case if the principal facts in evidence are narrated chronologically as far as possible.

1. For many years prior to 1943 the United States Army had an experimental and testing station for high explosive guns and other military weapons on a large tract of land in Harford County, Maryland, known as the Aberdeen Proving Grounds, situated on a long neck of land bordering the Bush River. In 1943 the Army developed a project for constructing an electric power substation and transmission line from a point some miles west of the Bush River to the Aberdeen Proving Grounds to supply high powered electric current for supersonic wind tunnels and other uses. Very elaborate plans for this project with detailed drawings were prepared and after some revision were made the basis of a contract for the construction of the transmission line by private contractors. As part of the transmission line was to span the Bush River, which is about 3,000 feet wide at that point, it was necessary for the Army to obtain a permit for the erection of the line from the Secretary of War or of the Army as provided in 33 U.S.C.A. § 403. This was duly obtained (Respondent's and Defendant's Ex. No. 2). With the application for the permit there was filed a detailed engineering drawing describing the transmission line as it spanned the Bush River. The interpretation of the engineering data on the plat is not readily interpretable by the layman but I understand counsel are in agreement that the essential point disclosed is that the cable was to have a clearance at its lowest point of 34½ feet above "mean high water". In passing it is to be noted that at high tide the surface of the water may be above "mean high water". After the span across the Bush River had been completed in early 1944 it was inspected by the District Engineer and found to have been erected in accordance with the requirements of the permit. It, therefore, was then a lawful structure and not an unlawful obstruction to navigation.

2. The transmission line as it crossed the Bush River consisted of a catenary system having three wires above and two below. The upper wires carried 110,000 volts and the lower wires 69,000 volts. They were suspended on 7 "H" type posts or pylons mounted on piles in the river. The whole transmission line was owned and operated and maintained by the Government until in 1950 when, as of July 1st, an elaborate government contract with the Gas and Electric Company was entered into by the terms of which the Gas Company was to operate and maintain and if neces-

sary replace or repair, in accordance with customary practice, the whole transmission line, and to furnish and supply electric current for the use of the Army at the Aberdeen Proving Grounds, and any surplus of energy could be supplied by the Gas and Electric Company to private customers. The contract was an elaborate formal government contract for the supplying of electric power, most of the terms of which were of no particular applicability to this case, but paragraphs 9 and 10 of the special provisions are said to be in point with reference to the maintenance of the line as stated, and the Gas and Electric Company was to be liable for any negligence in the installation of its meters and other necessary apparatus for the furnishing of electric power. The transmission line itself remained the property of the government and the Gas Company contends that by proper construction of the contract the reference to negligence with regard to apparatus applied only to such new installations or equipment as it furnished. An annual contract price for furnishing the electrict power was to be paid by the government to the Gas and Electric Company in the amount of $500,000. I fail to find in the contract (and counsel have not called my attention to) any reference to the required clearance of the cable above "mean high water", and there seems to be no recital with regard to the required clearance. Before the Gas and Electric Company took over the operation of the transmission line it was surveyed by a Mr. Wilkinson, a competent official of the Gas and Electric Company, who found it in order for the purposes of the contract.

3. On the plans for the project in 1943 the height of the cable at the point of attachment to the pylons was to be not less than 48½ feet from the water. The sag in the wire between pylons was to be 13.4 feet at zero temperatures. For some reason not explained in the evidence, the chart then published by the United States Coast and Geodetic Survey for the Bush River (Chart No. 572) stated that the clearance of the cable was 49 feet. On July 23, 1949 the plaintiff navigated his yacht up the Bush River and through the railroad draw-

bridge, open at the time, to attend a regatta on the other side of the bridge. The plaintiff said that he had measured the antenna on the yacht and that at that time it reached 35 feet from the water. He observed the cable at the time and encountered no difficulty in navigating under it. He said that he knew that it was an electric power cable but supposed it carried only about 5,000 voltage.

4. On September 3, 1950 one Busick, a young yachtsman, was navigating his sailboat in the Bush River under the cable. The mast of his boat was 35½ feet above the water. In passing the mast apparently struck the cable and received an electric discharge which damaged the boat and threw Busick into the comparatively shallow water. He suffered no personal injury after the momentary shock but he notified the Gas Company and asked for compensation for the damage to his boat in the amount of $178.89. He conferred with Mr. Biddison of the office legal department of the Gas and Electric Company, who, under instructions from an executive officer, paid the claim and took a release which recited that the Gas and Electric Company admitted no liability. This item of evidence added to the confusion in the case and at first blush seemed to be prejudicial to the contention of the Gas Company against liability. But in the perspective of the evidence as a whole I have concluded that the incident lacks any real significance with respect to the legal question as to liability. Mr. Biddison explained that the executive officer who authorized the payment of the comparatively small claim did so as a matter of policy and out of sympathy for Busick as a fellow yachtsman. The release given by Busick recited that the clearance stated on the chart was improper. When the Gas and Electric Company learned this fact, which it apparently had not previously known, it promptly called the attention of the Coast and Geodetic Survey to the error which was corrected in the next revised chart published some months prior to July 7, 1951, which, for the first time, showed that the clearance under the cable was 34 feet.

5. On July 7, 1951 there was to be another regatta on the Bush River above the railroad bridge. The plaintiff gave notice to the Railroad Company that he wished the draw opened about 1 P.M. He boarded his yacht that morning at Bear Creek near Sparrows Point some miles fro--- the Bush River, and said at the time he noticed that the tide was unusually low. He sailed without incident up and into the Bush River approaching the cable and the bridge, the draw of which was still not open, about 1 P.M., standard time, or 2 o'clock daylight time. The plaintiff says that some time between 1949 and 1951, when the bamboo mast had been unshipped and was lying on the ground in his yard, he accidentally ran his automobile over it and broke off the top end for a distance of what he estimated to be about three feet. However, he did not measure the bamboo mast at any time thereafter and prior to July 7, 1951. As a witness in this case he testified that in approaching the cable, he made no calculation as to whether the mast would clear the cable because he assumed that the mast was not more than 32 feet, and that he had read the chart 572 which showed the existence of the cable with a clearance of 34 feet; and also as he was approaching and about to pass under the cable its height was obstructed from him by the roof of the pilot house in which he was seated steering the boat. He also testified that he had chart 572 on the boat at the time though not in the pilot house, and also had chart 1226 (on a larger scale) which did not show the cable. He said he also had a copy of the Coast Pilot which showed the clearance to be 34 feet. The effect of the electric shock was to cause the boat to temporarily lurch over to starboard, the bamboo mast being on the port side of the yacht resting in a bracket affixed to the side of the cabin. The electric discharge fused or disintegrated a part of the copper wiring on the mast, more particularly near the so-called loading portion of the mast for ship to shore communication. Some fragments or disintegrated portions of the wire were splattered against the cabin windows. A few very small pieces fell on the clothing of himself and one or more of his three passengers. The plaintiff seated in the pilot's chair was not thrown from the chair by the force of the shock but one of the passengers who was standing ready to anchor if necessary, momentarily lost balance by the lurch of the boat. After the electrical discharge the boat proceeded on its way under its own power and went through the draw which was opened shortly thereafter, attended the regatta and the next day the yacht with the plaintiff and his passengers returned to his home in Baltimore County. The bamboo mast was unshipped from the bracket for the return trip.

6. The plaintiffs account of the occurrence was sharply contradicted by three credible witnesses in two important respects. These three were eye witnesses of the electric discharge. One was the bridge tender who was to open the draw of the bridge, and two were yachtsmen who were on the east bank of the River at the time. Their attention was called to the incident by observing a flash and hearing the noise of the explosion. All three of them stated that they had previously observed the Gallant Lady had passed under the cable in going toward the bridge without incident and that while waiting for about 15 minutes for the draw to open the yacht had idled around under merely steerageway between the bridge and the overhead cable, finally resulting in the flash. The bridge tender further testified that the Gallant Lady approached the bridge before the draw was open to inquire when it would be open and was told that it would be in a few minutes. Other witnesses testified that while the yacht was idling around between the bridge and the cable (a distance of about 400 feet) there were 15 or 20 other small craft in the immediate vicinity also waiting to go through the draw to attend the regatta.

7. With respect to the height of the tide at the time, while the plaintiff had stated that a few hours before there was an unusually low tide, the actual state of the tide according to recorded hydrographic measurements was .9 feet above mean high water in the Bush River at that time, 12:30 P.M. standard time, July 7, 1951. When the yacht proceeded through the

draw the bridge tender inquired whether any one on board had been hurt and the reply from the yacht was to the contrary.

8. On July 9, 1951 personal counsel for the plaintiff wrote a short letter to the Gas and Electric Company notifying it of the accident and a claim for damages without further specifying any personal damage. A similar letter was written by counsel to the United States Army Engineers about the same time. But prior to this, on July 12, 1951, the Gas and Electric Company sent three of its office staff, Messrs. Lummis, Davis and Bittner, to make a survey of the height of the cable above the water. It was not practicable to do this by throwing a measuring line over the cable itself as that would have interrupted necessary service to the Army and others. The survey was, therefore, made by a transit and triangulation. Davis called off the measurements from the transit to Lummis who recorded them in Davis' presence in his log book (Defendant's Ex. No. 8) and Lummis called back the figures to Davis in check. Bittner was also a third member of the surveying party at the time the measurements were made. Lummis, a competent surveyor for the Gas Company, habitually engaged in that class of work, died suddenly from a heart attack two days before the trial of the case began. The admissibility of his entries in the log book were objected to by counsel for the plaintiff on the ground that they were not entries made in due course of business. See Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645. But in my opinion the evidence as to the result of the survey is admissible in view of the testimony of Davis and Bittner who assisted in making the survey, and the further testimony of Wilkinson of the Gas and Electric Company who verified the calculations from recorded data made by Lummis in the presence of Davis. See also Wigmore on Evidence, 3d Ed. Vol. 3, § 748(b). The survey showed the following.

9. Measurements were made of the lower cables and at the lowest point in each of the three spans which possibly might have been used in the approach to the bridge. In the middle span most directly in the channel approach to the draw of the bridge, the cable was 33.6 feet above the surface of the water. The tide, however, was .9 feet above mean high water. In the span to the right, that is toward the east bank of the river (the line there runs almost from west to east in crossing the river) the lowest point in the cable was 33.4 feet above the water and thus more than 34 feet clearance above mean high water. In the other span toward the west bank of the river the lowest point was 33.2 feet or at least 34 feet above mean high water. I accept these measurements as correct in view of all the evidence. It is certainly the best obtainable and indeed the only direct evidence as to the height of the cable above mean high water at the time.

10. On July 20, 1951 Lummis and Tyson, the latter of the office staff of the Gas and Electric Company, visited the premises of the plaintiff and measured the length of the bamboo mast by a steel tape. Lummis made a hand-written report of the measurements to Wilkinson. Counsel for the plaintiff has objected to this report on the ground that it was not such a record as could be considered to have been made by Lummis in due course of business and was therefore to be excluded under the case of Palmer v. Hoffman, supra. I think this objection is good and therefore sustain the objection to the hand-written report by Lummis. However, Tyson, who accompanied Lummis and observed the measurements that were made, recalled at the time that the length of the bamboo mast was 28 feet 6 inches. Although other and different measurements were later made there is little variation in the height of the deck of the yacht from the water and the height of the deck to the lower portion of the bracket in which the mast was erected. The variations in measurement as to the latter figures are little, the measurements by Lummis and Tyson having been 6 feet from the water to the bottom of the bracket; while other measurements later made were 5 feet 9 inches and 5 feet 6 inches. On the evidence I conclude that the height of the top of the mast above the water was 34 feet 3 inches. The plaintiff did not testify to any measurement at any time made by him or by any

one for him either before or after the accident. Six months after the accident a measurement was made by Mr. Schilp, a marine surveyor, at the request of counsel for the Underwriters. Mr. Schilp's measurement may have been made with a two-foot ruler. He made the length of the mast 26 feet 5 inches and the height of the bracket above the water 5 feet 9 inches or a total of 32 feet 2 inches. Another measurement was made by two representatives of the Government about a year after the accident. Their measurement of the bamboo mast was 27.6 feet and the height of the bracket above the water line 5½ feet, or in all approximately 33 feet. It is my view that the measurement made a few days after the accident by a competent witness Tyson, disregarding the recorded memorandum report of Lummis, is more convincing and reliable than measurements made six months and a year after the accident, especially in the absence of any further details in the evidence with respect to the custody and observation of the mast which was not produced by the plaintiff at the trial but was said to be on the boat in Florida.

11. On July 19, 1951 the plaintiff visited the office of the Coast and Geodetic Survey in Baltimore and vigorously complained to Commander Paton, in charge of the office, about the charts. Paton was a highly credible and I think comparatively disinterested witness whose testimony was given clearly and positively. He said that the plaintiff came in in an excited manner, or, as the witness expressed it, "in a frenzy". Apparently the plaintiff's excitement was over his complaints about the incorrectness of the charts. The plaintiff said that he had received the electric discharge when he passed 4 feet under the cable. This was apparently due to the plaintiff's calculations that his mast was 32 feet, that the tide was minus 2 feet and the clearance was 34 feet. The plaintiff referred to his boat and Paton thought he was referring to the mast of a sailboat. Paton told him that the chart 572 for the Bush River showed the clearance to be 34 feet. The plaintiff said that the cable was not shown on the chart 1226, and that he, the plaintiff, did not have and did not need to have chart 572. The accident was previously unknown at the time to Paton who, however, immediately wrote a letter to the Director of the United States Coast and Geodetic Survey at Washington. This letter read:

"Recently a sailboat suffered an accident while passing under a power cable in the Bush River. The owner of the boat claims his mast cleared the cable by 4 feet but a heavy charge jumped the gap and caused a damage of about $3,000. It is recommended that electrical engineers be consulted as to what would be a safe distance to pass under such cables and this information shown in our Coast Pilot."

Paton was asked by the Washington office for further details, some of which were then written by Paton in pencil on his carbon copy of his letter of July 19, 1951 to Washington, after further talks with the plaintiff by telephone. In addition to the further details as to the extent of the damage to the boat the plaintiff said more specifically that his mast was 32 feet 2 inches and there was a minus 2 feet tide, that the cable carried 110,000 volts, that it was a dry day and that the plaintiff "did not go under the center of the span". (See Res. Ex. No. 1). Apparently the plaintiff made no mention of any personal injuries as a result of the accident.

12. In 1952 the Gas and Electric Company pursuant to plans made in the latter part of 1950 or at least prior to July 7, 1951, obtained permission to make improvements to the transmission line including the spans crossing the Bush River, whereby the pylons would be mounted on concrete foundations rather than on piling, and the clearance above mean high water would be increased by at least several feet. Authorized permission was given and the lines have been accordingly changed. Whether due to the action of the Gas and Electric Company or to that of the Coast and Geodetic Survey does not appear but there has recently been placed signs on the transmission line across the river warning that the cable is a high powered cable. Of course on familiar legal principles this

subsequent action with regard to the clearance and the signs is not to be considered evidence of negligence prior to the accident. United States v. Norfolk-Berkley Bridge Corp., D.C.E.D.Va., 29 F.2d 115 District Judge Soper.

13. The uncontradicted expert evidence (by the witness Dr. Wolfe) was that a cable carrying 69,000 volts would not arc or jump an electric discharge to a grounded object more than six inches from the cable. The same witness expressed the opinion that on the description given by witnesses at the trial which he had heard, as to the condition of the bamboo mast at the top and at lower portions, with special reference to the copper wiring already referred to, as the copper wire was not disintegrated and apparently little disturbed for several inches from the top, the mast had come in contact with the cable some inches below the top of the mast. The plaintiff as a witness said that he did not know whether or not the mast had struck the cable. Commander Paton testified, however, that the plaintiff had told him on July 19, 1951 that the yacht had passed four feet under the cable. In the absence of any other evidence as to whether the mast had struck the wire or the electric current had jumped from the cable, I accept this opinion from Dr. Wolfe as the best available evidence on the otherwise uncertain fact.

14. With respect to the disputed fact as to the height of the mast, I find it necessary in appraising the weight of the evidence to consider the credibility of some witnesses and particularly that of the plaintiff. He said that the height of the mast in 1949 was 35 feet from the water when he measured it. He also said that prior to 1951 he had accidentally run over and broken the top end off the mast to a length which he judged to be about 3 feet. This was the principal basis for any knowledge that he personally had as to the height of the mast on July 7, 1951. I do not feel that it would be safe to appraise the weight of the evidence in this case by accepting the uncorroborated statement of the plaintiff as to this fact. The defendant has offered evidence attacking the credibility of the plaintiff. He is directly contradicted on important features of his evidence by other witnesses entirely credible in my opinion on at least three points. (1) As to the height of the tide; (2) as to when the electric discharge occurred and (3) as to his possession of the information on chart 572. He also made other statements to Commander Paton directly contradictory to his testimony as a witness in this case; still further the defendant offered evidence not disputed by the plaintiff, that in 1944 he had been convicted in the Circuit Court for Baltimore County of receiving stolen goods, for which he received a sentence of one year, but was released after the expiration of two months. Plaintiff protested that he was really innocent of the charge. In this same connection reference should be made to the plaintiff's present claim for damages in the amount of $100,000 for personal injuries resulting from the accident. As to this, it is to be remembered that he made no claim for personal injuries promptly after the accident, was able to navigate his yacht without difficulty to and from the regatta, and the first claim made by his personal attorneys did not mention personal injuries. The first suits filed were for damages to the yacht alone without a claim for personal injuries. Three months later the suits for personal injuries were filed. There was evidence from other witnesses that about a year after the accident the plaintiff replied to an inquiry as to what happened, saying that fortunately no one aboard was hurt.

■■ The plaintiff is a man 56 years of age, obviously more than ordinarily intelligent and an experienced navigator of his yacht. His physical condition long prior to the accident was unfortunate. As early as 1933 he had an advanced stage of arthritis. By 1938 this had advanced to such a state that the vertebrae in his back bone were entirely fused and he was able to walk only in a bodily bent forward condition with the aid of two canes. He had been engaged in the filling station business for some years and apparently profitably. When his bodily conditon became crippling, he turned over the entire management of his business to his sons but continued in a supervisory capacity. He said that he was comparatively free from pain prior to the accident of

July 7, 1951. In the prior year, however, he had had a bad fall in his home which had further incapacitated him for a considerable period of time. He said that prior to the accident he had had no motion in his neck and was comparatively free from pain. After the accident, as a witness in this case, he complains that he has had severe headaches, that he now has some movement in his neck which he at first attributed to a loosening of the theretofore fused vertebrae or a fracture of one of them. His son as a witness testified that his father frequently complained of pain and severe headaches since the accident and that his visits to the business were much less numerous than prior to the accident. The plaintiff claims that he has spent about $1100 for medicines and doctors since the accident. The medical evidence as to his present condition and the cause of it is not convincing with reference to any objective findings of the doctors apart from the plaintiff's own statement as to subjective symptoms. As the burden of proof is on the plaintiff to show that the accident was the proximate cause of his present subjective symptoms, I do not find the evidence affirmatively sufficient to warrant the conclusion that he has suffered any substantial personal injuries from the accident. There is, however, substantial evidence of some damage to the yacht on July 7, 1951. He made the assertion to Commander Paton that this damage was about $3,000. At the trial there was evidence or statement of counsel for the insurer that they had paid about $7,000 for a fire loss to the boat. The extent of the damage to the boat is not admitted by counsel for the defendant and detailed evidence on that phase of the case has not yet been submitted.

Coming now to the applicable law of the case, it will be noted that the plaintiff's charge of liability or negligence by the defendants respectively is on two main contentions which are alleged in each of the four cases. One is that the existence of the cable on July 7, 1951 constituted an unauthorized obstruction to navigation by reason of the alleged fact that the cable did not have a clearance of at least 34 feet above mean high water. The other basis of lia-

bility is the absence of any warning signs on the cable that it carried high voltage. The first question is one of fact; and the second is one purely of law.

As to the fact, I have found on the weight of the evidence that the cable had approximately 34½ foot clearance above mean high water, and accordingly was not an unauthorized obstruction because it had been officially permitted by the Secretary of the Army in accordance with section 403 of title 33 United States Code Annotated. I do not understand that this legal conclusion is disputed if the facts are so found.

The contention of the plaintiff is that the clearance under the cable was only 32′ 1½″. The only evidence offered to support this contention was the opinion of one Morris, a graduate student in engineering at the Johns Hopkins University. He was shown the detailed drawings for the project in 1943 (Res.—Def.Ex.No.3) and expressed the opinion that if the transmission line had been built precisely in accordance with the drawings the sag in the span would have been increased by the temperature at midday on July 7, 1951 (82 degrees) to such an extent that the clearance under the cable at the lowest point would have been only 32′ 1½″. He expressed this opinion on the assumption that the height of the pylons where the cable was attached was only 48½′. But by the measurements made by Lummis and Davis on July 12, 1951 the height of the wire at the pylons was 50′. It may also be noted that when application for the permit for the installation of the cable crossing the Bush River was submitted to the Secretary of War it was accompanied by an engineering plan which, it was agreed, provided for a clearance of 34½′, and before the permit became effective the cable construction was found to be in accordance with the requirements of the permit by the United States District Engineer (Davis).

The plaintiff also submitted an argument to the effect that the cable must have had a clearance of only about 32′ because the yacht's mast was only 32′ 2″ and would not have received the electric discharge either by contact or arcing if the clearance had been more than 32′ 8″. However, this ar-

gument disappears on the findings that I make that the clearance of the cable above the surface of the water was more than 33′ and the height of the mast above the surface of the water was more than 34′. (In this connection we may disregard the state of the tide which, as previously pointed out, was .9′ above mean high water, making the required clearance of the cable above mean high water at the lowest point 34′ or more). It was not shown in the evidence precisely at what point of the cable the electric discharge occurred. But if, as I think it is reasonable to conclude in accordance with the opinion of Dr. Wolfe, the cable had contacted the mast some inches below the top, then it seems probable that the electric discharge occurred at some point on the cable other than the lowest point of the sag.

 Before discussing the second ground on which the plaintiff bases his charge of liability of the defendants, I will now turn to the contention of the defendants that the accident was due to the negligence of the plaintiff himself. On the evidence I conclude that the plaintiff was negligent in his navigation. He knew of the existence of the catenary system in the Bush River because he had passed under and observed it in 1949 when his mast was 35′ high. He knew that the cables carried electric current although he did not know of what voltage but said that he supposed it was only about 5,000 volts; but this was obviously merely a volunteered guess on his part. On July 7, 1951 he had made no measurement of the height of his mast since 1949, as he stated, but had broken off the end of it which he merely judged to be about three feet in length. He evidently had not made any particular inquiry as to the tide in the Bush River at the time. Whether or not he actually knew the clearance of the cable was 34 feet, he was chargeable with that knowledge for the purposes of navigation. In approaching the cable he made no effort to observe the clearance of the cable above the water. Even assuming that he really believed the mast to be only 32 feet and knew the clearance to be only 34 feet, it seems almost incredible that an intelligent man like the plaintiff skilled in navigation would have paid no attention to where he was passing under a cable which at some point was approximately 50 feet above the water but at other places was only 34 feet. The most direct channel approach to the drawbridge was slightly to the east of one of the pylons where there was unquestionably ample clearance for even a 35-foot mast. Presumably the plaintiff had used that approach in 1949 when, if he saw the charts at that time, they erroneously showed clearance to be 49 feet. Furthermore as I find from the great weight of the credible evidence, the plaintiff in 1951 again passed safely under the cable in approaching the bridge but thereafter allowed his yacht to idle around for fifteen minutes between the drawbridge and the cable while waiting the draw to open and without paying any attention whatever to the position of the yacht with regard to the cable. As an intelligent man experienced in navigation this carelessness on his part seems to me to be entirely inexplicable except on the inference which I make from all of the evidence that at the time the plaintiff had the impression that the lowest point under the cable was at least 49 feet, as indeed the charts in 1949 had erroneously so stated. And I think the testimony of Commander Paton as to his conversations with the plaintiff shortly after the accident strengthens this inference. The plaintiff was, of course chargeable with the information contained on the revised chart which had been published some months prior to the accident. I conclude, therefore, that the plaintiff himself was guilty of negligence in navigation at the time of the accident, which caused or contributed to the accident.

 As a witness the plaintiff said that while he knew that the cable carried electric power and supposed it possibly was as much as 5,000 volts, he did not know that it carried a very much higher voltage and particularly did not know that the current would arc or jump for some distance to a grounded object. But this is no answer to his contributory negligence. In Le Vonas v. Acme Paper Board Co., 184 Md. 16,

21, 40 A.2d 43, 45, it was said by the Maryland Court of Appeals:

"In accordance with these basic principles, the law does not require that a person, who maintains even so deadly an instrumentality as a high voltage electric wire, shall anticipate at his peril every possible fortuitous circumstance under which some person might make a contact with the wire, resulting in injury or death. * * * The fact that a wire is charged with electric current is notice of danger, and any person mindful of his safety should treat it with caution. When a person voluntarily touches, or approaches nearer than a reasonably prudent person would, an electric wire, which he knows, or which a person of ordinary knowledge and experience would have reason to believe, is sufficiently charged with electricity to be dangerous, and in consequence thereof he is injured, it will be assumed as a matter of law that his own negligence contributed to the accident."

▆ Counsel for the Government contends that, as the suits against the United States are only under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2571 et seq., where the liability, if any, depends upon the law of the place (in this case Maryland) the negligence of the plaintiff, even if only a contributory cause to the accident, is a complete bar to recovery. The only Maryland case cited in support of this point is Elzey v. Boston Metals Co., 189 Md. 566, 56 A.2d 692. In that case the plaintiff was injured while working in the hold of a ship which was fastened to the dock and was being dismantled. It was held that he could not recover because guilty of contributory negligence; but I do not find in the opinion any discussion of the question whether, assuming the ship to have been in navigable waters, the rule in admiralty of the division of the damages would apply. However that may be, nevertheless I conclude that even in a suit under the Federal Tort Claims Act where the accident occurs on navigable waters, the admiralty rule for division of damages rather than the common law rule barring recovering for contributory negligence should apply. In the 4th Circuit case of Somerset Seafood Co. v. United States, 193 F.2d 631, where the tort arose on navigable waters in Virginia, it was held that if both plaintiff and defendant were negligent the admiralty rule for division of damages should be applied; but the decision was based on Virginia cases which so held as to the law of Virginia. In the instant case I do not know of any Maryland decision which clearly holds that in a case of a maritime tort in Maryland waters the common law must be applied in preference to the admiralty rule for division of damages. Nevertheless it is my opinion that recent judicial decisions in the 2nd and 3rd Circuits have now taken the view that in such a situation the admiralty rule must prevail. Hawn v. Pope & Talbot, Inc., 3 Cir., 198 F.2d 800; W. E. Hedger Transp. Corp. v. United Fruit Co., 2 Cir., 198 F.2d 376. And it seems clear enough that in the two admiralty suits against the Gas and Electric Company the admiralty rule must be applied if there was negligence by both parties. It is therefore necessary to determine whether the second ground of liability asserted in the instant case by the plaintiff against the defendants respectively is sustainable.

▆ The plaintiff alleged negligence in the failure to place conspicuous signs upon the cable warning that it carried high electric voltage. It seems necessary, or at least desirable, to consider the point with respect to the Gas and Electric Company and the United States separately. As to the former, I fail to find any adequate basis to hold the Gas and Electric Company liable. The cable had been lawfully erected by the United States in 1944 under a permit from the Secretary of War. At the time of the accident the cable was still owned by the Government and the relation of the Gas and Electric Company to it was under a contract not of a maritime nature. The contract imposed no duty or obligation on the Gas Company with regard to the clearance required, and there is no evidence in the case that the Gas and Electric Company had failed to fully perform all its ob-

ligations to the United States under the contract. More specifically there was no evidence that the Gas and Electric Company has failed in any duty with regard to the maintenance of the cable; nor did the Company have any duty or responsibility with regard to the charts published by the United States Coast and Geodetic Survey. There was no requirement under the contract that the Company place any signs upon the cable nor indeed does it appear that the Company would have had the right to do so except with the Government's permission. There is no evidence that the Gas and Electric Company even knew what clearance was required by the permit, or that the Government charts before 1951 had erroneously stated the clearance to be 49 feet, until in September 1950 it received a report of the accident to the Busick boat which received an electric discharge from the cable to the boat's mast over 35 feet; and then promptly when the Gas Company learned that the charts previously were in error as to the clearance, it notified the Coast and Geodetic Survey and the proper clearance was noted on the subsequently published charts.

There was affirmative evidence in the case that electric power cable crossings of navigable waters is quite customary and so far as I can recall there was no evidence that such cable crossings bore signs that they carried high voltage. Positive instances were cited of such cable crossings on the not too distant Chesapeake & Delaware Canal, and a government witness having supervision over 600 miles of navigable waterways in and around Pittsburgh, Pennsylvania, said that he knew of no signs so placed on such cables.

Nor do I find sufficient evidence in the case to impose liability on the United States under the Tort Claims Act. The cable crossing was a lawful structure under the permit from the Secretary of War which made no requirement for the placing of signs or lights thereon other than such as might be required by the Coast and Geodetic Survey, which made none. The plaintiff does not specify any agent of the United States to whose negligence, if any, the failure to place signs on the cable could be attributed. In this connection see In re Texas City Disaster Litigation, 5 Cir., 197 F.2d 771, now on appeal to the Supreme Court.

Hindsight is proverbially better than foresight and it is certainly desirable that since this accident signs have been placed on the cable warning the public of possible danger therefrom. It is not necessary in this case to hold that under no circumstance would there be liability on the owner or maintainer of such a cable over navigable waters if proper warning were not given. It would seem that the proper place for such a warning would be in the navigation charts issued by the Coast and Geodetic Survey. The navigator is chargeable with the information contained on such charts and a prudent navigator will, of course, consult such charts before a contemplated voyage by vessel. In the instant case the proper chart disclosed the existence of the cable and its clearance but did not state the nature of the cable. If it be assumed that the failure of the chart in this respect was a negligent omission, there is no evidence to show just how or why or by whose fault it occurred. Nor have counsel referred me to any judicial authority to the effect that such an omission on the government navigation charts is sufficient to impose liability on the government under the Tort Act. Though the chart did not disclose the nature of the cable, the plaintiff knew it was an electric power cable. It is unnecessary to further extend the discussion because here we are dealing with the facts of a particular case in which the plaintiff seeking damages was himself negligent in navigation. I therefore conclude that there is no proper basis here for a division of damages.

For these reasons all four of the plaintiff's suits must be dismissed with allowance of taxable costs to the defendants. And in view of the conclusion reached there is no occasion to consider the third-party complaint of the Government against the Gas and Electric Company and the counterclaim of the latter in the civil actions.

Counsel may present the appropriate orders in due course.