**BECKER PRETZEL BAKERIES, INC.,**
a Maryland corporation,

v.

**UNIVERSAL OVEN COMPANY,** Incorporated, a New York corporation.

**Civ. No. 16554.**

United States District Court
D. Maryland.
Feb. 15, 1968.

---

Franklin Goldstein and Burke, Gerber & Wilen, Baltimore, Md., for plaintiff.

Herbert F. Murray and Smith, Somerville & Case, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is an action by the purchaser of a large pretzel oven, Becker Pretzel Bakeries, Inc. (Becker), against the manufacturer-seller of the oven, Universal Oven Company, Inc. (Universal), to recover damages caused by a fire in the oven some months after it had been installed. At the trial before a jury plaintiff offered evidence that the fire was caused by slippage of the meshes in the oven; that there had been excessive slippage in the oven from the time it was installed and that Universal had made some ineffective efforts to correct the alleged defect; and that Universal's failure to include clean-out doors (sometimes called fire doors), or other adequate means to prevent or reduce fire damage, increased the damage caused by the fire.

The complaint alleged breach of express warranty, breach of implied warranty, and negligence. The court ruled as a matter of law that Becker was not entitled to recover for breach of implied warranty, but allowed the jury to consider the claims based upon alleged breach of express warranty and negligence. The court submitted seven questions to the jury, which were answered as follows:

"(1) Was the fire in the oven caused by any defect in the oven? Yes.

"(2) If the jury answers question No. 1 'yes', did the claim involved in this suit arise by reason of faulty operation of the oven by plaintiff? No.

"(3) Was the fire in the oven caused by any negligence on the part of defendant? Yes.

"(4) Was the fire in the oven caused or contributed to by any negligence on the part of plaintiff? No.

"(5) At what sum does the jury fix the damages to the oven and its contents caused by the fire? $5,782.39.

"(6) Did plaintiff sustain any additional production costs due to the fire? Yes. If the answer is 'yes', what was the amount of such additional production costs? $3,432.48.

"(7) Did plaintiff sustain any loss of profits due to the fire? No. If the answer is 'yes', what was the amount of such loss of profits? _____."

Plaintiff has moved for judgment on the special verdicts. Defendant has moved for judgment n. o. v. or, in the alternative, for a new trial.

*Facts*

There was evidence legally sufficient to prove the following facts.

Becker, a Baltimore bakery, entered into discussions with Universal, a manufacturer of large baking ovens, for the purchase of a pretzel oven. Becker was represented in these discussions by its president, a member of the bar; Universal was represented by its president and by Irwin Elliott, a recognized expert in

the design of ovens, then employed by Universal. After specifications were submitted to Becker and accepted, an "Order and Conditional Sale Contract", prepared by Universal, was signed by Becker and became effective when approved by Universal at Westbury, New York, on March 29, 1963.

The pertinent parts of the contract are as follows:

"One . . . No. . . . Universal . . . 90′ Pretzel Oven with wire mesh hearth and double pass drying kiln in accordance with specifications and terms as per our proposal dated February 8, 1963, FOB Westbury, N. Y., Supervision Only—customer to supply necessary assisting labor, all State, local and Federal taxes, if applicable, will be additional. * *

" * * *

"Total, $72,925.00 [1]

" * * *

"2. This contract, including the terms and conditions on the reverse side hereof, constitutes the entire agreement between the parties and no representative of the seller has power to alter the provisions hereof in any respect.

"3. This contract shall become binding upon the Seller when approved by one of its duly authorized officers at its principal office in New York, N. Y., or by one of its duly appointed credit managers; no deposit of check or money on account of this Order in the Seller's bank shall be construed as an acceptance until this Order is formally accepted by the Seller, as aforesaid."

The contract provided that it was subject to various terms and conditions, printed on the reverse side of the contract, of which the following are material in this case:

"3. The Buyer assumes the risk of injury or destruction from any cause whatsoever to this Property after delivery and also any damage by this Property to persons or property, and no such injury, damage or destruction shall excuse payments or other liabilities hereunder.

"4. The waiver by the Seller of one or more breaches in the terms of this Contract shall not constitute waiver of any other breaches.

"5. *Guarantee:* The Seller warrants this Property to be free from defects but the Seller shall not be liable for a breach of this warranty if any claim arises by reason of faulty operation of this Property by the Buyer or unless notice of breach of such warranty is mailed by registered mail to the Seller within five days of such breach. The liability of the Seller, in any event, shall be limited to exchanging any part of this Property, without charge, F.O.B. New York for a period of one year from date of shipment if after receipt and inspection at the Seller's factory such part proves to be defective, provided that said defective condition was not caused by reason of faulty operation of this Property by the Buyer and provided further that the payments have been made by the Buyer as agreed, and in no event shall any claims for consequential damages be made. There are no implied warranties.

"11. The responsibility of UNIVERSAL OVEN COMPANY, INC. for materials or services obtained by Buyer for use in connection with this Property is limited to written authorizations from its home office.

"16. There are no conditions, representations or warranties, verbal or otherwise except as herein stated. This contract *cannot be modified except by further written agreement.*"

In May and June of 1963, Universal shipped all of the parts of the oven to Becker's plant for assembly. Universal's installation supervisor stayed in Balti-

---

1. The terms of payment were as follows: $18,231.25, with order; $18,231.25, on notice of shipment; $18,231.25, upon completion of erection; and $18,231.25 thirty (30) days from completion of erection.

more during the course of the three-month installation. At the completion of construction the oven was fired successfully, at first without product in it, later with product in it.

After Universal's installation supervisor left Baltimore in August of 1963, Becker began having trouble with the meshes in the oven, which were frequently slipping because of improper tension. The "take-up" devices on the oven were insufficient to stop the slippage. Becker notified Universal's designer of the slippage, and in October or November 1963, Universal's installation supervisor was sent back to Baltimore. He cut pieces out of the meshes on all three sections of the oven—the baking chamber at the top and two drying kilns below.

Shortly after the supervisor returned to New York, the meshes began slipping again. Becker informed Universal's president and Elliott, its designer, of the slippage. Elliott visited Becker's plant, observed the slippage and stated that he would "look into it". At no time before this suit was filed did anyone from Universal complain to Becker about the operation or maintenance of the oven by Becker's employees.

Before signing the Order and Conditional Sale Contract, Becker's president and plant superintendent had discussed with Universal's designer the advisability of cutting doors, known as "clean-out" or "fire" doors into the oven, so that if a fire occurred the fire could be reached quickly and the burning product removed from the oven. However, the Order and Conditional Sale Contract contained no provision for such doors. When Universal's installation supervisor returned in October or November, he cut, at the request of Becker's plant superintendent, one or more doors into the baking chamber. No such doors were cut into the two drying kilns below. Subsequently, Universal's designer, while inspecting the oven, sent a Becker employee to a junk yard to try to obtain doors to be used when the openings were cut in. The employee could not find suitable doors at the junk yard, and the openings were never cut.

On May 15, 1964, the mesh in the bottom drying kiln stopped and the Becker employees were unable to get it started. Pretzels caught fire in the center of the kiln. The Fire Department was called and inserted high pressure hoses at one end of the kiln to put out the fire. Substantial damage was done to the oven and its contents, and additional production costs were incurred by Becker as a result. The evidence shows that the damage was greatly increased by the failure to provide fire doors in the kiln compartments.

Universal was immediately notified of the fire and within a few days sent its installation supervisor to Baltimore to supervise the repair of the oven. After the oven was back in operation, another Universal employee came to the Becker plant to try to alleviate the slippage. That employee lagged the drive drum on the bottom kiln and the mesh stopped slipping.

*Discussion*

■■ The evidence was legally sufficient to prove that the fire was caused by a defect in the oven, i. e. a design and construction which caused excessive slipping of the meshes. The evidence also justified the finding of the jury that the fire was caused by negligence on the part of Universal. Universal argues that Becker did not produce any expert testimony to prove that the oven failed to comply with recognized standards in the industry. Becker did produce its plant superintendent, who has worked with other ovens in the Becker plant and has seen fires in those ovens. He testified to his experience with slippage on the other ovens and the necessity for and utilization of fire doors, and stated that the slippage in the oven in question was excessive. This was competent expert testimony for the jury to consider. See Scott v. John H. Hampshire, Inc., 246 Md. 171, 227 A.2d 751 (1967). Moreover, Universal recognized the seriousness of the slippage problem by sending its in-

stallation supervisor to the Becker plant on several occasions to deal with the slippage, which was not cured until another employee from Universal lagged the drum after the fire.

Next, Universal claims that Becker failed to comply with Condition 5 of the contract (which contained an express warranty that the oven would be free from defects) because Becker did not give registered mail notice of breach of warranty within five days or send back any part for replacement. However, the evidence shows that soon after the installation of the oven, Universal was notified by telephone of the slippage, and sent its designer and installation supervisor to the Becker plant on several occasions to deal with the problem. Universal never told Becker that it would no longer honor its warranty because registered mail notice had not been given, or because the parts had not been sent back to Universal's New York office. The problem was slippage of the meshes. Universal recognized that it was impractical to disassemble the 90-foot oven, which had taken three months to assemble, and to send it back to New York. Universal has admitted that since its customers are not in a position to bring their ovens to its office, Universal must go to them to make repairs. Accordingly, when the slippage problem developed after the installation, Universal sent its own employees to the Becker plant to try to solve the problem. While there, Universal's designer was also made aware of the need for fire doors. After the fire, Universal's installation supervisor was again sent to the Becker plant to supervise the repairs, and another Universal employee was sent to deal with slippage.

■■ The course of dealings shows that Universal waived formal notification

by registered mail and sending back the oven. This result is not altered by New York General Obligations Law, sec. 15–301 (McKinney's Consol.Laws, c. 24–A, 1964), cited by Universal, which provides:

"A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."

It is true that paragraph 2 of the contract stated that "no representative of the seller has power to alter the provisions hereof in any respect", and that condition 16 prohibited modification "except by a further written agreement". In the present case, however, we are not dealing with an oral modification of the contract, but with a waiver by conduct of certain conditions, and an estoppel to rely on those conditions. New York cases construing sec. 15–301 have held that a party can be estopped by his own conduct from claiming the benefit of the statute. See, e. g., Meadow Brook Nat. Bank v. Feraca, 33 Misc.2d 616, 224 N.Y.S.2d 846 (Sup.Ct.1962); Rosenbaum-Grinell, Inc. v. Bart Schwartz International Textiles, Ltd., 15 Misc.2d 450, 182 N.Y.S.2d 441 (Sup.Ct.1958); Gray v. Met. Contracting Corp., 4 A.D.2d 495, 872, 167 N.Y.S.2d 498 (1957). See also Goldner Trucking Corp. v. Stoll Parking Corp., 24 Misc.2d 262, 193 N.Y.S.2d 736 (Sup.Ct.1959).[2]

■ Universal also contends that statements by its designer, that he would "look into" the fire door situation and try to correct the slippage, were improperly admitted into evidence because they amounted to an attempted oral modifica-

---

2. These cases are based upon the reasoning of Judge Cardozo in a concurring opinion in Imperator Realty Co. v. Tull, 228 N.Y. 447, 455, 127 N.E. 263, 265–266 (1920), where he said:

"A contract is the sum of its component terms. Any variation of the parts is a variation of the whole. The requirement that there shall be a writ-

ing extends to one term as to another. There can therefore be no contractual obligation when the requirement is not followed. * * * There may be procurement or encouragement of a departure from literal performance which will forbid the assertion that the departure was a wrong."

tion of the contract in violation of sec. 15–301 and the parol evidence rule. However, in its charge, the court was careful to instruct the jury that if they found that such promises were made, the promises "did not become a part of the contract between the parties", but could only be considered along with other evidence, on the issues of whether or not (1) the slippage was caused by a defect, (2) the fire was caused by Universal's negligence, (3) Becker was negligent in operation of the oven, (4) the absence of fire doors was a defect, and (5) Universal and/or Becker was negligent in not installing fire doors. Consequently, allowing those statements into evidence did not violate N. Y. General Obligations Law, sec. 15–301 (McKinney, 1964) or the parol evidence rule.[3]

Universal next contends that condition 3 of the contract, in which Becker "assumes the risk of injury or destruction from any cause whatsoever", excuses Universal from liability for its own negligence.

■■■ A threshold question is whether Maryland or New York law applies. In a diversity case a federal court must follow the conflict of laws rules prevailing in the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Maryland conflicts rule is that questions as to the construction and legality or validity of a contract are governed by the law of the place where the contract was made. *Scott v. First Nat. Bank of Baltimore,* 224 Md. 462, 168 A.2d 349 (1962); *Union Trust Co. of New Jersey v. Knabe,* 122 Md. 584, 89 A. 1106 (1914); *Mandru v. Ashby,* 108 Md. 693, 71 A. 312 (1908). Inasmuch as the contract in the present case was prepared by Universal in New York and became effective when signed by Universal in that state, New York is the place where the contract was made. The determination of whether or not condition 3 was intended by the parties to excuse Universal for its own negligence is a question of construction. Therefore, New York law governs this question.

■■■ The New York law on the right of a party to absolve himself from liability for his own negligence is set out in *Willard Van Dyke Productions, Inc. v. Eastman Kodak Co.,* 12 N.Y.2d 301, 304–305, 239 N.Y.S.2d 337, 339, 189 N.E. 2d 693, 694–695 (1963):

"The law looks with disfavor upon attempts of a party to avoid liability for his own fault and, although it is permissible in many cases to contract one's self out of liability for negligence, the courts insist that it must be absolutely clear that such was the understanding of the parties. In other words, it must be plainly and precisely provided that 'limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility.' (*Howard v. Handler Bros. & Winell,* 279 App.Div. 72, 75–76, 107 N.Y.S.2d 749, 752, affd. 303 N.Y. 990, 106 N.E.2d 67; see, also *Ciofalo v. Vic Tanney Gyms,* 10 N.Y.2d 294, 296–297, 220 N.Y.S.2d 962, 963, 964, 177 N.E.2d 925; *Kaufman v. American Youth Hostels,* 5 N.Y.2d 1016, 185 N.Y.S.2d 268, 158 N.E.2d 818 [128] modfg. 6 A.D.2d 223, 177 N.Y.S.2d 587; *Boll v. Sharp & Dohme,* 307 N.Y. 646, 120 N.E.2d 836, affg. 281 App.Div. 568, 121 N.Y.S.2d 20; *Walters v. Rao Electrical Equipment Co.,* 289 N.Y. 57, 43 N.E.2d 810, 143 A.L.R. 303; *Thompson-Starrett Co. v. Otis Elevator Co.,* 271 N.Y. 36, 41, 2 N.E.2d 35, 37; *Employers' Liability Assur-*

---

3. Universal also points to the fact that at a hearing on Universal's motion for summary judgment, counsel for Becker had indicated that he felt that the promises by Universal's designer to "look into" the slippage problem, and that fire doors would be cut in, amounted to a novation or new contract. During the course of the trial, Becker abandoned that contention. The court, however, had not restricted Becker's use of those statements to an attempt to prove a novation; it was proper for Becker to offer the statements at trial as part of its proof on the five issues listed above.

ance Corp. v. New York Linen Supply & Laundry Co., 239 N.Y. 560, 147 N.E. 195; Mynard v. Syracuse, B. & N. Y. R. R. Co., 71 N.Y. 180, 183.)

"In line with this principle, we have consistently decided that contracts will not be construed to absolve a party from, or indemnify him against, his own negligence, 'unless such intention is expressed in unequivocal terms.' (Thompson-Starrett Co. v. Otis Elevator Co., 271 N.Y. 36, 41, 2 N.E.2d 35, 37, supra.) In the Thompson case (271 N.Y. 36, 2 N.E.2d 36, supra), for instance, the court concluded that an agreement to indemnify one 'against all claims for damages to persons growing out of the execution of the work' was not phrased in terms sufficiently unequivocal to encompass the indemnitee's negligence. In the Kaufman case (5 N.Y.2d 1016, 185 N.Y.S.2d 268, 158 N.E.2d 128, supra), the court held that an agreement to release the defendant 'of any and all responsibility or liability of any nature whatsoever for any loss of property or personal injury occurring on this trip' lacked the requisite clarity to relieve the defendant of liability for its own negligence. And, in the Mynard case (71 N.Y. 180, supra), where the plaintiff agreed to 'release and discharge the said company [defendant] from all claims, demands and liabilities of every kind whatsoever for or on account of, or connected with, any damage or injury to or the loss of said stock, or any portion thereof, from whatsoever cause arising', the court determined that, despite the breadth of the language employed, it was not sufficiently explicit to absolve the defendant from its own negligence."

 Applying these principles to the case at bar, we see that condition 3 does not expressly exclude Universal's liability for negligence or other fault; therefore condition 3, although not void as against public policy, was insufficient to absolve Universal for liability for its own negligence. Compare Ciofalo v. Vic Tanney Gyms, Inc., 10 N.Y.2d 294, 220 N.Y.S.2d

962, 177 N.E.2d 925 (1961); Theroux v. Kedenburg Racing Ass'n, 50 Misc.2d 97, 269 N.Y.S.2d 789 (Sup.Ct.1965).

Universal contends that Standard Accident Insur. Co. v. Murray, 31 N.Y.S.2d 319 (Sup.Ct.1941), and Mercante v. Hygrade Food Products Corp., 258 App.Div. 641, 17 N.Y.S.2d 625 (1940), require a different result. The *Standard Accident* case is a one-paragraph per curiam opinion which says that an agreement to assume all risks and liability for accidents, entered into by the plaintiff as a condition for receiving the defendant's permission to enter defendant's premises, was valid to absolve defendant from liability. The court also found that no negligence on the part of the defendant or freedom from contributory negligence on the part of the plaintiff was shown.

In *Mercante*, plaintiff, a workman painting the outside wall of defendant's building, was injured when he fell from a scaffold supplied by defendant. Plaintiff had signed an agreement which absolved defendant from damages for "injuries which may occur to us while on duty" and stated that plaintiff and his fellow employee were "to be responsible for such accidents" themselves. The New York court found that the agreement was "an assumption of all risks attending the work, including such as might arise from defendant's negligence". 258 App.Div. at 642, 17 N.Y.S.2d at 626.

This court concludes that in view of the more recent New York cases cited above, the intention of the parties in the case at bar was not to absolve Universal from liability for its own negligence. Such a limitation of liability could have been effectuated if condition 3 had expressly excluded liability for negligence or fault. In the absence of such express language, the court concludes that exculpation of Universal's liability for negligence was not intended, especially since Universal, a New York corporation, which presumably was familiar with and wished to rely on New York law, drafted the printed form of contract.

Finally, Universal argues that the court erred in permitting Becker to show

that after the fire Universal employees lagged the drum on the bottom kiln, which cured the excessive slippage.

 While it is true that evidence of subsequent repairs may not be received as an admission of liability or as evidence of a negligent construction,[4] such evidence may be admissible for other purposes. As Judge Watkins said in Jennings v. United States, 207 F.Supp. 143 (D.Md.1962), aff'd per curiam 318 F.2d 718 (4 Cir. 1963):

> "Most persuasive on this point is whether, as counsel for plaintiffs argues, after the accident the Government deepened the drainage ditch thereby alleviating the prior nuisance. Generally evidence of subsequent repairs is not admissible. An exception exists to this rule of evidence and is recognized in Maryland. In American Paving and Contracting Company v. Davis, 1916, 127 Md. 477, 96 A. 623, the defendant had used a screen over the smoke stack of its steam shovel after a fire had occurred damaging plaintiff's property. The Maryland Court of Appeals held that the 'mere fact that the defendant or its servants after the fire put a wire hood or screen over the smoke stack would not be admissible for the purpose of establishing an admission of liability by the defendant (Ziehm v. United Electric, etc., Co., 104 Md. 48, 64 Atl. 61; Columbia & P. S. R. Co. v. Hawthorne, 144 U.S. 202, 12 Sup.Ct. 591, 36 L.Ed. 405), but evidence of the effect of the screen was admissible as reflecting upon the question whether the defendant had exercised proper care and caution to avoid injury to the plaintiff's property'. * * * "

207 F.Supp. at 148.

 In the present case the evidence with respect to lagging the drum on the bottom kiln was not offered to show an admission or that the original construction was negligent, but was offered as part of Becker's proof tending to show (1) that the express warranty against defects in the oven had been breached, and (2) that Universal, with knowledge of the slippage, had not exercised reasonable and proper care and skill in its efforts to cure the defect before the fire. Rule 43(a), F.R.Civ.P., directs that: "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held". The *American Paving* case, cited by Judge Watkins, shows that such evidence would have been admissible for the purposes specified above under the rules of evidence applied in the courts of general jurisdiction of the State of Maryland.

Although there was evidence to support the able and forceful argument made to the jury by Universal's counsel that the oven was not defective and that Universal was not negligent, the court has concluded that the verdict was not against the evidence nor against the weight of the evidence.

The motion for judgment n. o. v. or, in the alternative, for a new trial is hereby denied. Judgment will be entered for the plaintiff in accordance with the findings of the jury.

4. Columbia & Puget Sound R. Co. v. Hawthorne, 144 U.S. 202, 12 S.Ct. 591, 36 L.Ed. 405 (1892); Thompson v. Consolidated Gas Electric Light & Power Co. of Baltimore, 111 F.Supp. 719 (D. Md.1953); United States v. Norfolk-Berkley Bridge Corp., 29 F.2d 115 (E.D. Va.1928); Barnes v. Housing Authority, 231 Md. 147, 189 A.2d 100 (1963); Long v. Joestlein, 193 Md. 211, 66 A.2d 407 (1949); Stewart & Co. v. Harman, 108 Md. 446, 70 A. 333, 20 L.R.A.,N.S., 228 (1908). See also Stein v. Overlook Joint Venture, 246 Md. 75, 227 A.2d 226 (1966), where the court held that a portion of a building code enacted after an accident occurred was inadmissible to show the standard of care required at the time of the accident.