Anna JENNINGS, administratrix of Stewart Earl Jennings, deceased,

v.

UNITED STATES.

STATE OF MARYLAND to Use of Anna JENNINGS, surviving wife, Anna Frances Jennings, a minor, Russell Earl Jennings, a minor, Gregory Stewart Jennings, a minor, and the unborn child or children, eventre sa mere, of Stewart Jennings

v.

UNITED STATES.

Margaret M. JENNINGS in her own right as mother and next friend of Donald S. Jennings, and Donald S. Jennings in his right

v.

UNITED STATES.

Civ. A. Nos. 9063, 9064, 9313.

United States District Court
D. Maryland.

July 3, 1962.

Paul R. Connolly, Jr., David N. Webster, Jeremiah C. Collins (Hogan & Hartson), Washington, D. C., Hugh Lynch, Jr. (Macleay, Lynch & McDonald), John J. Pyne, Washington, D. C., John H. Bolgiano (Smith, Somerville & Case), Baltimore, Md., and George A. Chadwick, Jr. (Frost & Towers), Washington, D. C., for plaintiffs.

Joseph D. Tydings, U. S. Atty., and Daniel McMullen, Asst. U. S. Atty., Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

The three above named consolidated cases, brought under the Federal Tort Claims Act, were tried by this court, which filed an opinion finding for the plaintiffs, and embodying its findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P., 28 U.S.C.A. (Jennings v. United States, D.Md.1959, 178 F.Supp. 516). Thereafter appeals were filed by plaintiffs and cross-appeals were filed by the Government in the United States Court of Appeals for the Fourth Circuit. That court held that under the Maryland law, proof of the presence of a patch of ice on the Suitland Parkway on the morning that the accident in question occurred and proof of the fact that Jennings' car skidded upon the patch of ice was not sufficient evidence to support the judgments rendered by this court in favor of the plaintiffs. (Jennings v. United States, 4 Cir. 1961, 291 F. 2d 880). The Fourth Circuit went on to state, however, that there was other evidence which might support recovery upon a different theory, i. e. "[i]n Maryland it has been held that there is no liability for injuries caused by a design defect in a highway, but if a defect, whether of design or not, creates a condition which would itself constitute a nuisance, reasonable care to abate it is not exercised and the condition is the effective cause of the injury, no reason presently appears why the agency charged with maintenance of the highway should not be responsible as for any other nuisance it unreasonably permitted to exist." (291 F.2d at 887). Chief Judge Sobeloff in a concurring opinion concluded "[i]f the water collected at this spot because of poor drainage, or defective construction, or improper maintenance, or some other circumstance under the defendant's control, and if the ice thus formed was allowed, after actual or constructive notice, to remain without the defendant taking steps to abate the condition, there could be a basis for liability" (291 F.2d at 892). For these reasons the judgments in favor of the plaintiffs were vacated and the three consolidated cases remanded for proceedings not inconsistent with the opinion of the Court of Appeals for the Fourth Circuit.

On the extensive evidence relating to all phases of these cases offered at the trial, this court does not deem it necessary to take further testimony on remand.[1] A consideration of the evidence already in the record relative to the drainage conditions on the Suitland Parkway during January 1956 is therefore not only proper, but is required, to comply with the mandate of the United States Court of Appeals for the Fourth Circuit.

The court, after a study of the memoranda submitted on behalf of plaintiffs and defendant on remand, and a reconsideration of the record in its entirety, finds as facts that Suitland Parkway, at the time in question, was defective, both in design and construction, and as so constructed and maintained constituted a nuisance; that reasonable care to abate such nuisance was not exercised by the defendant after both actual and constructive notice; that such defective condition was the effective, or at least an effective, cause of the injury; that

---

[1.] Perhaps understandably, both plaintiffs and defendant agree that no further testimony is necessary if, on the evidence offered, the court should find in their, or its, favor. The court believes this reasonably means, and independently so concludes, that the evidence before it is sufficient for the decision of the case on the principles set forth in the majority and concurring opinions in the Court of Appeals, and that no further testimony or evidence is necessary.

the water collected at the accident spot because of poor drainage, from defective construction and maintenance, all under defendant's control, and that the ice that formed as a result thereof was allowed, after actual and constructive notice, to remain without defendant taking effective steps to abate the condition, and that the injuries complained of resulted from such conditions.

These conclusory findings are predicated upon the court's interpretation of the whole record, including its observation of and conclusion as to the testimony of the witnesses, rather fully detailed in connection with the court's then understanding of the law, set forth in its previous opinion herein. However, the specific additional findings leading to this result, on remand, are set forth in what is hoped will be understandable and excusable minutiae.

To make the court's findings intelligible, an explanation of how particular sections of the Suitland Parkway are identified is in order. Much of the testimony as well as many of the exhibits introduced into evidence all pin point the various significant areas on the Parkway by station. The point of collision was approximately 23,500 feet east of station 0 + 00, which is the beginning of the Parkway in the District of Columbia. Station 1 + 00 is 100 feet, so that the point of impact was referred to as approximately station 235 + 00.

Plan profile sheets covering stations 225 to 289 proceeding from west to east (Government exhibits 12–A and 12–B) were introduced into evidence. The court is of the opinion that the drainage conditions existing somewhere between station 237 + 00 and station 237 + 50 are most crucial,[2] but will nevertheless make findings as to drainage in adjacent areas as the over-all drainage system is of significance.

Government exhibit 12–A shows that the drainage system planned for the highway from station 225 to station 257, a distance of some 3,200 feet, consisted of a combination of curb or pavement surface drains and roadway ditch drains.[3] The contract drawing called for the construction of eleven curb drains on the south side of the road spaced approximately 300 feet apart while only three curb drains were to be built on the north side of the road. There were no curb drains on the north side of the road from station 225 to station 250 + 50. Thus to the west of the point of impact there were no curb drains at all on the north side of the road. To the east the closest curb drain on the north was at a distance of 1500 to 1550 feet.

Going from west to east, roadway ditch drains were located in the general area involved to the north of the road at the following stations and at the following distances apart; at station 229 + 50, 300 feet from station 232 + 50; at

---

2. The point of collision was either at or slightly east of station 235 + 00. The court has previously found that the Jennings car traveled at least 200 feet from the westernmost edge of the ice patch to the point of collision and that the ice patch was at least 25 feet in length. Accordingly, moving from the point of impact to the easternmost edge of the ice patch the location would be station 237 + 25. As there was voluminous testimony to the effect that the water (which later became ice) came to be upon the highway by draining from the north bank across what was referred to throughout the trial as a "swale" or drainage ditch and across the curbing on the north, the most persuasive view of the evidence is that the vital area to be considered by this court ranges from station 237 + 00 to station 237 + 50.

It should be remembered that the Parkway slightly rises as one goes eastward from station 235 + 00 to station 237 + 50. Thus, any water entering the highway near station 237 + 50 would certainly flow in a westerly direction from Forestville Road toward Washington, D. C. as well as in a southerly direction, as there is a slight slope in the road from north to south.

3. Although not shown by the exhibit, testimony made it clear that the roadway drains were located in the middle of a slightly depressed drainage ditch or "swale" which ran parallel to the road and to the north of the road. The court will consider the role that the swale played in the drainage problem later on in this opinion.

232 + 50, 300 feet apart from station 235 + 50; at 235 + 50, 650 feet apart from station 242; at station 242, 550 feet from station 247 + 50; at station 247 + 50, 300 feet away from station 250 + 50; at station 250 + 50, 525 feet from station 255 + 75, and at station 255 + 75. Although the relative locations of roadway ditch drains cannot be said, standing alone, to manifest an inadequate drainage system, it should be noted that in a significant area, that is from station 235 + 50 to station 242, the roadway drains to the north are further apart than at any other point on the entire stretch of highway from station 225 to station 257. In connection with the roadway drains, a headwall structure was used at all of the drains except the one located at station 232 + 50. As explained by a Government witness, a headwall is a structure that is built at the end of a pipe or a box culvert to prevent erosion, to protect the pipes and to keep the water *in its natural drainage ditch.* The only effective one in this case, located north of the "B" road,[4] was at station 242, 700 feet away from the point of impact and approximately 500 feet away from what the court considers to be the point at which the melting water, which later changed to ice, entered the highway.

The total inadequacy of the drainage system is further evidenced (1) by the testimony of many residents and passers-by that this area of the highway was a known danger spot; (2) by the testimony of witnesses who time and again saw water from rain and melting snow come down off the north bank, run across the curbing and onto the road; (3) by the testimony of witnesses to the effect that after the accident the swale was deepened and made wider and that thereafter noticeable improvement in drainage resulted, and (4) by the testimony of Government witnesses Rennie, Brown and Wheaton, which does not contradict, and indeed supports, the testimony of the eye witnesses as to when (i. e. during heavy rainfalls) and how the water entered the highway, and leads to the conclusion that the swale as built was inadequate by the Government's own standards for swale depth.

Summary of Eye Witness Testimony Indicating Improper Drainage.

Wirth, a mechanic at Andrews Air Force Base, who had traveled the Suitland Parkway for two or three years prior to the accident and who was in the car with which the Jennings car collided, in recounting whether or not he had ever encountered icy conditions at the spot of the accident prior to the accident, stated that in going west:

"You would be awful careful going by this place, it has a bank there; when it snows or *rains,* let's say, for instance, if it snowed, the mid-day sun would melt the snow, and part of it would run across the curbing, which the grass was flush [sic]; this little curbing was two or three inches high. It would run out in the road and across, and it was a pretty good size plotch." (Transcript, page 13; emphasis supplied).

The witness continued

"well, the water was running off the road southward, and there was more water standing on the north side of the road than there would be on the south side as it drained across. It

---

4. Suitland Parkway was originally designed and graded throughout its entire length for a dual highway but only a portion, at the Washington, D. C., end has been paved and completed as a dual highway. Where the accident occurred, the road was a two-lane highway with no center strip, the road being referred to during the trial as the "A" road. The graded but unpaved roadway which was intended to be the other half of the dual highway was identified as "B" road. The two roads were not on the same level but "B" road was on a higher slope than "A" road. The importance of this fact in regard to the drainage problem is inescapable. There were drains on the "B" road which were intended to have taken care of any surface waters running from that elevated section down to the "A" road; however, although these drains had been installed they were not operating when the accident occurred.

would freeze and form on the north side more than it would on the south side, but it would get wet, and a little slippery on the south sometimes." (Transcript, page 31).

Vigue, an executive with a corporation in New York, testified that in 1956 he traveled over the Suitland Parkway twice a day, once in the east direction and once in the west direction and that:

"*Water* coming off from the hills onto the road was not unusual." (Transcript, page 91; emphasis supplied).

He added that he had seen ice on the spot in question

"two or three times during the year of 1956, and probably four to five times during the year 1955." (Transcript, page 78).

Carey, a master plumber, who had been traveling the Parkway frequently from 1945 to the date of the accident, and who was related to Mrs. Jennings, went to the scene of the accident. His testimony relative to the drainage condition existing there was as follows:

"The only situation prior to the accident I noticed in several cases, drainage there prior to the accident. That has always been a bad spot, and it didn't happen just prior to the accident. This spot has been a dangerous spot." (Transcript, page 129).

Earlier the witness had described the scene of the accident as being one where the "drainage" was running across the road (Transcript, page 121).

Pumphrey, a preventive maintenance man, who had driven over the Parkway four or five years prior to, and continuing to, 1956, skidded on a patch of ice on the day that Stewart Jennings was killed at a spot on the Suitland Parkway that he identified as being the scene of the accident and characterized the inadequacy of the drainage system serving that area, as follows:

"In that vicinity, I have seen ice in along there. It seemed like it might freeze there during the night or something, and then the water would come across the highway. I have seen that."

When questioned as to the frequency of this occurrence, he responded:

"Well, if they had snow and such like that, you would notice it, or *a heavy rain* or something like that." (Transcript, page 154; emphasis supplied).

Mintz, a sign writer at Bowling Air Force Base, who had traveled the Parkway for over a year, skidded on ice in the area where the accident occurred on the morning of the accident. He stated that the presence of *water* or ice on the Parkway in this area whenever the weather conditions were bad was not unusual, characterizing the particular spot as "a wash place" (Transcript, page 171).

Madison, an employee of the Naval Research Laboratory, who had used the highway from 1947 to 1950 and from 1954 to 1959 had had occasion to observe ice on the highway in the area in question and stated categorically that the ice was caused by "[w]ater coming down off the side of the bank onto the road." (Transcript, page 179).

Glaubitz, an electrical engineer with the Naval Research Laboratory, and fire chief of the Morningside Volunteer Fire Department and Rescue Squadron, in response to a question as to whether or not he had noticed anything with respect to drainage, testified that he had seen water running across the road in the crucial area prior to the accident, that the accident area was partly shaded due to trees, that in the afternoon the sun would melt the snow on the northern bank and that the melted snow would come down the northern bank onto the road. (Transcript, pages 213–214).

Crickard, an employee of Diamond Ordnance Fuse Laboratory in Washington, D. C., traveled over the Suitland Parkway every day to and from work. He described the accident area as follows:

"Over the total of the Parkway, which I travel there is two or three

places that has this type of condition existing. This one, the only place here, was the one that would always be the worse the one where I observed, the one where the accident occurred." (Transcript, page 299).

\* \* \* \* \* \*

"If there was snow on the side of the road that would melt during the day with the sun on it, and also could exist or had existed if it rained to any great extent and the ground had frozen and then thawed there could be water running across or onto the highway." (Transcript, page 300).

Middleton, employed at the Naval Gun Factory in Washington, D. C., had occasion to ride daily back and forth over the Suitland Parkway. He identified the crucial area and stated:

"That in my experience was the only dangerous part of the road at that time that morning and from what I can ascertain from past experience, no matter what speed anybody can be going, that area was extremely hazardous because I come from a part of the country where conditions like this are common place, especially in the early part of the spring and that is from Wisconsin." (Transcript, pages 327 to 328).

As to the source or cause of the water which later became ice, the witness was asked whether or not he observed what was causing the ice on this section of the Parkway, to which he responded:

"Oh, yes. The water that was running over the road over the ice, *coming from the slope on the right hand side* of the road, you could see water. As a matter of fact, you could see it spilling over the edge of the concrete shoulder." (Transcript, page 334; emphasis supplied).

All of this testimony as well as testimony referred to in this court's prior opinion, which need not be restated here, leads the court to but one conclusion, that is, that whenever it snowed or whenever a heavy rain occurred, the drainage facilities serving the accident area were inadequate and insufficient for their intended purpose, that such insufficiency and inadequacy were well known to the frequent users of the Parkway, and were or should have been known to the governmental agency charged with maintenance of the highway; that the existence of an insufficient drainage system created a condition which in and of itself was a nuisance, that the patch of ice on the highway on the particular morning herein involved was attributable to a long existing insufficiency of drainage and that the patch of ice was the effective cause of the injuries complained of by the plaintiffs. The remaining question for the court is whether or not the Government in the exercise of reasonable care *could* have abated the nuisance.

■■ Most persuasive on this point is whether, as counsel for plaintiffs argues, after the accident the Government deepened the drainage ditch thereby alleviating the prior nuisance. Generally evidence of subsequent repairs is not admissible. An exception exists to this rule of evidence and is recognized in Maryland. In American Paving and Contracting Company v. Davis, 1916, 127 Md. 477, 96 A. 623, the defendant had used a screen over the smoke stack of its steam shovel after a fire had occurred damaging plaintiff's property. The Maryland Court of Appeals held that the "mere fact that the defendant or its servants after the fire put a wire hood or screen over the smoke stack would not be admissible for the purpose of establishing an admission of liability by the defendant (Ziehm v. United Electric, etc., Co., 104 Md. 48, 64 Atl. 61; Columbia & P. S. R. Co. v. Hawthorne, 144 U.S. 202, 12 Sup.Ct. 591, 36 L.Ed. 405), but evidence of the effect of the screen was admissible as reflecting upon the question whether the defendant had exercised proper care and caution to avoid injury to the plaintiff's property." (See also: Consolidated Gas, Electric Light & Power Co. v. State, Use of Smith, 1909, 109 Md. 186, 200–201, 72 A. 651, in which the Maryland Court of Appeals recognized the exception to the general

rule by admitting into evidence testimony as to subsequent changes, even although such testimony related to repairs or additional precautions, when it fairly tended to show the actual conditions existing at the time of the injuries).

The Government has consistently, and the court does not doubt in good faith, maintained throughout the entire case that no subsequent repairs were made to improve the drainage in the area in question of the Suitland Parkway. The Government had at least three witnesses [5] who testified that no changes were made in and around the area where the accident occurred. In spite of such denials, the plaintiffs succeeded to this court's satisfaction in establishing that a road grader tilted its blade in the swale thus digging a ditch along the north side of the Parkway with resultant improvement in drainage conditions in the area. Plaintiffs introduced into evidence an enlargement of a photograph of the point of impact which photograph was taken within a week of the fatal accident. The photograph and its enlargement (plaintiff's exhibit No. 3 and plaintiff's exhibit No. 3–A) clearly show that work was done which deepened the drainage ditch or swale on the northern side of the Parkway. Were the photograph and its enlargement not absolutely clear as to what they show, the testimony of numerous

witnesses supports plaintiffs in their contention. The following witnesses saw the result of the work—Vigue (Transcript, pages 74–75); Miller (Transcript, page 114); Carey (Transcript, pages 127, 129–130); Humphrey (Transcript, page 153); Mintz (Transcript, pages 166–167); Madison (Transcript, pages 179–180); Glaubitz (Transcript, page 206); Middleton (Transcript, page 335) and Humphreys (Transcript, page 349 [6]); in addition Branson, a construction superintendent for Corson and Grauman, a paving contractor, who had frequently used a road grader to dig trenches, testified that in his opinion the trench shown in plaintiffs' exhibit No. 3 and No. 3–A was made by a road grader and that the physical condition shown was not of the type that he would expect if a road grader had been used merely to break the crust off of ice or snow. (Transcript, pages 584–586).

In summary, the exhibits showing the trench, the testimony of the nine eye witnesses who either saw it being dug or saw the trench after it was completed and the testimony of Branson as to his appraisal of what plaintiffs' exhibit 3 and 3–A indicated had been done, all justify the finding of the court that the depth of the swale on the north side of the Parkway was changed by means of digging a trench shortly after the accident. This

5. Robey was one of these witnesses. As Chief of the east area of the National Capital Parks, he was directly responsible and supervised the maintenance of Suitland Parkway. He was called by the counsel for plaintiffs and treated as a hostile witness. After exhaustive questioning he summarized the work which was done following the accident by saying "We put the blade in the swale to break the ice to facilitate the movement of water in the swale and get rid of that ice and material that might have been collected there." (Transcript, pages 463–464). This testimony directly from the man responsible for the work performed in the accident area is not inconsistent with the testimony of lay witnesses and an expert witness that intentionally or unintentionally a trench was dug which deepened the drainage ditch on the northern side of the Parkway.

6. Typical of the testimony of the eye witnesses who saw the work that was done is the following testimony of Middleton:
"* * * They had a trench dug by a plow, by all indications, and the dirt had been banked up toward the road, about two feet up to the edge of the road, which would indicate that a ditch had been dug, most likely along that whole area for that drainage." (Transcript, page 335).
The witness's conclusion as to the purpose for which the ditch had been dug was not stricken. However, when most of the other eye witnesses attempted to indicate why a ditch had been dug, upon objection, the court struck such conclusions. Now, upon a re-examination of the entire record including the transcript and exhibits the court finds as a fact that a ditch was dug and improved drainage was the result.

conclusion is reinforced by the testimony of those witnesses who stated that after the trench was dug the drainage in the area of the accident was materially improved. This noticeable improvement in drainage conditions in turn is evidence that the water from the melting snow which later became ice on the highway at the time of Jennings' death came off the north bank and out onto the roadway because of the inadequacy of the swale.

There is further evidence in the record that the depth of the swale when the highway was built failed to meet both the planned depth and the depth which "good road building practice" would dictate. Brown, who was the assistant district engineer under whose direct supervision the Suitland Parkway was planned and built, testified with reference to "typical" or recommended sections[7] of the highway that the low point of the ditch line was plotted as being six feet back from the curb at a depth of six inches. (Transcript, pages 1263–1264). A consideration of the depths shown on the "as built" plans indicates that the depth of the swale did not correspond with that originally proposed or with that which was in accordance with good construction practices. From the testimony of the Government's own witness Brown, who at the time of trial was then the chief engineer of the district office of the Bureau of Public Roads, the court concludes (1) that the depth of the swale did not conform to the depth originally called for in the proposed plans, (2) that the depth of the swale was not that dictated by good construction practices, and (3) the depth of the swale in the most critical areas was totally inadequate to meet the drainage problems in those areas. Keeping in mind that admittedly the swale is supposed to have a depth of one inch for each foot of distance from the curb and that the swale at station 237+50 was 11.5 feet north of the curb, the swale's deepest point should have been 11.5 inches deep. However, according to Mr. Brown's interpretation of the depth of the swale "as built" its low point at station 237+50 was .07 of a foot, or .84 of an inch. Since good construction practices called for a depth of 11.5 inches, the swale was 10.66 inches shallower than the plans called for or than dictated by good practices. A similar inadequacy existed at station 237+00. The swale was 11.5 feet north of the curb, indicating a required depth of 11.5 inches, while in fact it was only .26 of a foot or 3.1 inches in depth at its lowest point. Thus, the swale was 8.4 inches shallower than the plan called for or good practices required. Not unduly to belabor the point, the exhibit and testimony may be summarized as follows. At every station from 235 + 00 to 237 + 50, the actual "as built" depth of the swale was shallower than the planned and recommended depth with the exception of station 235 + 50, where a field drain was sunk in the ditch line and at which point the "as built" depth was .03 of an inch deeper than the recommended depth. Of great significance is the fact that the shallowest portions of the swale were located at station 236 + 50 and station 237 + 50, the places where in the court's judgment the water most likely entered the highway since, as previously explained, the easternmost point of ice and the highest point in elevation[8] of the roadway was located approximately at station 237 + 25.

7. According to his testimony the typical sections were "proposed sections to be constructed and were in accordance with good road building practice". Although in the general area in question, from station 234 to station 240, there is a curve in the road, the highway was built as a tangent or straight section because of the fact that the curve was so flat, that is one with a long radius.

8. This is not to say that station 237 + 25 is the highest point in elevation on the highway because the elevation of the highway continues to rise as one proceeds in an easterly direction. This finding is merely restricted to what the court considers relevant to the instant case.

■ Turning to a consideration of the elevations taken in 1959 in preparation for the original trial of this case, the conclusion is inescapable that the depth of the swale "as built" was totally inadequate for the purposes for which it was intended and that the swale was deepened sometime after its construction. Moreover, in view of the testimony of the nine eye witnesses who saw a trench, in view of the photograph of the digging operations within a week of the accident and further in view of the testimony that after the 1956 accident the drainage problem was materially improved the court finds that the swale was deepened within less than a week after the accident in question.

Normally one would expect that elevations taken in 1959 would reveal a shallower swale than the one which existed as of the time the Parkway was opened. Deposits of silt, sand, etc., in the ditch line carried by the rain and melting snow from the north bank would, to a certain extent, fill in the swale or ditch line. However, the elevations shown on Government's exhibit 15, taken in September 1959, show that the swale was deeper in 1959 than when it was first built, although the total elevations are higher. In 1959, at station 237 + 50, the depth of the swale is shown at .2 of a foot or 2.4 inches, in comparison with an "as built" depth of .84 inches. At station 236 + 50, the depth in 1959 was 1.4 inches in comparison with a depth of .96 inches shown on the "as built" drawings. At station 236 + 00, the 1959 depth was 4.8 inches. The "as built" depth was 4.4 inches. At station 235 + 50, the depth of the swale in 1959 was .7 of a foot or 8.4 inches, the "as built" drawings showing a depth of 7.8 inches. At station 235 + 00, in 1959, the swale's deepest point is .3 of a foot or 3.6 inches in comparison with the "as built" depth of 2.64 inches. Accordingly, the court finds that the swale was deeper in 1959 than when it was constructed although due to natural physical phenomena one would expect, and reasonably so, that the depth of the swale would have been shallower in 1959. From this it is a reasonable conclusion, which the court makes, that in spite of the Government's good faith denial that any changes had been made, in fact the swale was deepened. It logically follows, in view of all the previous testimony referred to as well as the exhibits, that the only reason for deepening the swale was that it was inadequate to meet the drainage problem involved.

The Government has argued that the water which later became ice got onto the highway from melting snow which was cleared from the highway, but permitted to remain in a mound at the side of the highway, and not from melting snow coming off the north bank. The testimony of the eye witnesses relative to what happened during heavy rainfalls has convinced the court that the water which later became ice came from melting snow naturally, and expectably, accumulated on the north bank. The testimony previously referred to in regard to improved drainage after the deepening of the swale dictates a similar conclusion. Likewise had the swale in fact been adequate in depth any water from the piled snow caused by plowing the roadway would have drained back into the swale rather than on to the highway.

Summary.

■ The testimony is overwhelmingly to the effect that the drainage system in the area in question was totally inadequate, as was the swale itself. Such inadequacies contributed to, and were a cause of the formation of the ice patch which caused Jennings' car to skid. The inadequacy of the drainage system including the swale with its resulting hazard to public travel on Suitland Parkway constituted a nuisance, which the Government could have abated in the exercise of reasonable care. The inadequacy of the drainage system including the swale had existed for a number of years prior to 1956.

Accordingly, the United States is liable to the plaintiffs in these consolidated actions in the amount of the judgments

previously entered by this court and vacated by the United States Court of Appeals from the Fourth Circuit.

These judgments are hereby reinstated.

