Daniel D. CHRISTOPHER

v.

UNITED STATES of America.

Civ. A. No. 29556.

United States District Court
E. D. Pennsylvania.

Feb. 3, 1965.

Jerome H. Ellis, Philadelphia, Pa., for plaintiff.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., Isaac S. Garb, Asst. U. S. Atty., for defendant.

WOOD, District Judge.

This non-jury action is a suit brought under the Federal Tort Claims Act 28 U.S.C.A. 1346(b). The plaintiff seeks to recover damages for injuries which he sustained while undergoing treatment in a Veterans' Administration Hospital in Baltimore, Maryland in 1959.

After a full and complete trial from December 14, 1964, until December 22, 1964, we find the following:

## FINDINGS OF FACT

1. The plaintiff, a 29 year-old Army veteran, was found to have tuberculosis of both lungs in December, 1958, after an examination conducted at a Veterans' Administration Clinic in Philadelphia, Pennsylvania.

2. Upon the recommendation of the Veterans' Administration (VA) Mr. Christopher entered the Loch Raven Veterans' Administration Hospital, Baltimore, Maryland on January 6, 1959.

3. On March 23, 1959, the plaintiff was operated upon for the partial removal of his right lung which procedure was successful and was followed by an uneventful recovery.

4. It was determined by the physicians at the hospital that a second oper-

ation was necessary on the plaintiff's diseased left lung. This surgical procedure was a resection of the upper lobe of the left lung and was performed on May 4, 1959.

5. A surgical team, including the Chief Surgical Resident, Edward Sharp, M.D., who was the surgeon, and Richard F. Kieffer, M.D., Head of the Surgical Service who assisted Doctor Sharp, coordinated their efforts in the operation.

6. The plaintiff's chest was opened by means of an incision extending between the fourth and fifth rib spaces on the left side beginning at a level near the nipple and extending posteriorly under the armpit and approximately to the fourth or fifth vertebra.

7. The periosteum (tissue around the bones) was then stripped from the fourth and fifth ribs, and these ribs were then disarticulated (which means that the joint between the rib and the articulating surfaces on the vertebrae was disrupted) from the transverse process of the fourth and fifth thoracic vertebrae by the use of an osteotome (surgical nippers or a chisel for dividing bone).

8. The osteotome was used to cut the ligaments which held the fourth and fifth ribs to the transverse processes of the fourth and fifth thoracic vertebrae. The transverse process is a lateral extension of bone attached to each vertebra.

9. The rib connects to the vertebra in two places. It touches the transverse process and is held to it by ligaments. It is also connected to the vertebral body itself. The connection of the head of the rib with the vertebral body had not been severed and it remained in articulation at that point.

10. After the two ribs had been disarticulated from the transverse processes, a rib-spreader was placed approximately midway into the incision and the ribs spread wide apart so that access could be gained to the chest cavity.

11. Doctor Kieffer entered the operation about the time the pleural cavity was opened, and he observed the patient's condition as being good and that the operation was proceeding normally.

12. The diseased portion of the left lung was excised, and Doctor Sharp inserted the chest tubes and removed the rib-spreader.

13. When the rib-spreader was removed constant bleeding developed in the posterior area of the incision behind the head of the fifth rib near the intervertebral foramen.

14. The intervertebral foramen in question is an opening in the bony structure of the spinal column through which the nerve roots and intercostal vascular branches pass through to the spinal column. It is located at the bottom of the fifth thoracic vertebra and at the top of the sixth thoracic vertebra. The opening of the foramen measures between one-quarter and one-half of an inch. It resembles a well in that it has some depth. At the bottom of the well is the dura which is the outer covering of the spinal cord.

15. Doctor Sharp, the operating surgeon, was the only witness who actually saw the bleeding since Doctor Kieffer had left the operating room at that point of the operation.

16. Doctor Sharp testified that he could not see the point from which the blood was flowing. His testimony disclosed that it was coming from behind the head of the fifth rib. He described the bleeding as constant " * * * which is different from what I would call arterial bleeding, in which you have a pulsation." (n. t. 391, 392) The head of the fifth rib is that area of the rib which connects with the spine.

17. A suture was placed circumferentially around the base of the fifth rib but this failed to control the bleeding completely.

18. In Doctor Sharp's Report of the Operation, he stated, in part, as follows:

"Oozing was noted from the *posterior angle* between the fourth and fifth ribs and examination revealed

bleeding from above the posterior margin of the fifth rib. It was thought that the *intercostal vein* was bleeding and a Kitner (sic), when placed posteriorly between the fourth and fifth ribs, stopped the bleeding." (emphasis supplied) (Ex. P–3 page 2 of 4 pages)

19. In his testimony, Doctor Sharp stated that in placing the Kittner he exerted light pressure and that he could not see the tip of the device all the time it was used.

20. A Kittner Dissector consists of two parts. The first part is a cotton ball approximately one-quarter of an inch in diameter and round consisting of packed cotton. The second part resembles a pair of pliers and is a metal clamp approximately eight inches long. The clamp is separated by a fulcrum. The length of the handle of the clamp to the fulcrum is seven inches and the distance from the fulcrum to the tip is one inch. The tip of the clamp consists of two parts which have rounded one-eighth inch tips that grip the cotton ball.

21. Doctor Kieffer testified that it was not advisable to use *clamps* to control bleeding from the posterior angle of the plaintiff's wound.

"A. Yes, sir. Bleeding in that area is rather inaccessible to direct instrumentation, there is not enough room; *and also one worries about possible injury to the spinal cord.*"

"Q. Is there any reason why *clamps* couldn't be used to control bleeding in that area?"

"A. *For those reasons.* The vessel runs closely applied to the undersurface of the rib where it is difficult to grasp it with a *clamp* separately from the accompanying bone; *and also because of concern about the spinal cord which lies nearby,* and the roots, nerve roots arising from the spinal cord." n. t. 332, 333) (emphasis supplied)

22. The bleeding began again and Doctor Sharp placed oxycel gauze, three inches by three inches, under pressure in the same area where the Kittner had been placed and this packing partially controlled the bleeding. He then placed a second pack of oxycel gauze on top of the first pack and this controlled the bleeding adequately.

23. Doctor Sharp then proceeded to complete the operation and he placed a third pack of oxycel gauze of equal size with the other two packs between the fourth and fifth ribs and closed the chest.

24. Oxycel gauze is a specially made absorbent material intended for control of bleeding inside an operative site and is intended to be left within the body as it will eventually be absorbed.

25. The plaintiff received six units of blood during the operation.

26. Following his removal from the operating room, the plaintiff was examined approximately one to two hours later when he was found to be unable to move his legs and paraplegia was discovered.

27. A lumbar puncture was performed on the plaintiff and this revealed the presence of blood tinged spinal fluid.

28. A Queckenstadt test was performed with pressure on the jugular veins and this failed to raise the plaintiff's spinal fluid pressure. The purpose of this test is to determine whether there is a blockage of the spinal canal.

29. Such a result indicated that there may have been a blockage of the spinal canal and the plaintiff was returned to the operating room for an exploratory thoracotomy to determine the cause.

30. Doctor James G. Arnold, a neurosurgeon, was immediately called and he advised the exploratory surgery.

31. Doctor Kieffer reopened the incision and he removed the oxycel gauze from the interspace between the ribs and in the region of the intervertebral foramen. The intervertebral foramen was enlarged and some of the oxycel packing was found inside and removed.

32. In this regard Doctor Kieffer testified as follows:

"Well, the intervertebral foramen is sort of like a small well with the dura like at the bottom of it, with the understanding, of course, that a dural extension along the nerve root may extend out into the intervertebral foramen, *and this gauze had been placed outside the foramen, and then by application of pressure some of it had gone in, as was desired, as a matter of fact, because I presume that some of the bleeding was in these vessels traversing the intervertebral foramen, and it is necessary to get the pack down there in order to stop the bleeding from those vessels that are in transit to and from the cord*." (n. t. 359) (emphasis supplied)

33. Doctor M. M. Ravitch, the *defendant's expert witness*, testified as follows:

"Furthermore, there is no particular need to put the pack down there." * * * "This isn't where the bleeding was occurring." (n. t. 614)

He further testified on cross-examination:

"There would have been no need to have gotten the pack down anywhere in that area. *There would have been no thought of putting it in the intervertebral foramen. That is preposterous*." (n. t. 618) (emphasis supplied)

34. In response to a question by the plaintiff's counsel, Doctor Ravitch made the following reply:

"Q. Doctor, I would like you to assume that the Oxycel gauze was placed inside the intervertebral foramen."

"A. That would have been improper."

* * * * *

"A. It would not have been necessary to stop the hemorrhage; it would not have been a good way to do it, and, furthermore, it is inconceivable to me." (n. t. 620, 621)

35. Upon removal of the oxycel gauze by Doctor Kieffer, spinal fluid was seen escaping from the intervertebral foramen. A one centimeter laceration of the dura was noted and spinal fluid was seen escaping freely through the tear which was sutured by Doctor Arnold. A questionable area of contusion of the spinal canal was noted in the Doctor's Progress Notes. (Ex. P–6 p. 2)

36. Doctor Arnold had entered the operation after the packing had been removed and the intervertebral foramen had been enlarged by Doctor Kieffer. He found no evidence of hemorrhage and the blockage was relieved when the gauze packing had been removed. (Ex. P–7 p. 2)

37. Nothing was found to account for the spinal block and the pathology recorded was a laceration of the dura (1 cm.) and cord compression from oxycel pad. (Ex. P–6 p. 3)

38. On the question of causation Doctor A. K. Olsen, an acknowledged expert in neurosurgery, testified as follows:

"Well, it is my opinion that this patient had had a piece of this Oxycel gauze stuffed into his spinal canal through that intervertebral foramen in which these people were working to get this bleeding stopped. The hemostatic gauze went into the spinal canal, contused the patient's spinal cord, and gave him a paraplesia." (n. t. 138) " * * * So this presents clear evidence to me that whatever was obstructing the spinal canal was removed when this gauze was removed." (n. t. 213)

39. Doctor Olsen gave his opinion that this occurrence was not consistent with proper and accepted standards of medical practice.

40. Before the operation of May 4, 1959, the plaintiff was never warned by any of the VA physicians concerned with his care or treatment of the risk or danger of paraplegia which might result in

connection with such an operation. However, there was no evidence that had the plaintiff been so advised of such danger that he would not have consented to the operation.

41. The plaintiff was born and raised in Philadelphia, Pennsylvania, and he attended local elementary and secondary schools prior to his enlistment in the United States Army in 1948.

42. The plaintiff was honorably discharged with the rank of sergeant in July, 1952, and he secured local employment as a draftsman.

43. In February, 1954, he enrolled in a course of aeronautical engineering at the University of Alabama and was graduated with the degree of Bachelor of Science in Engineering in June, 1958.

44. In September, 1958, the plaintiff became employed as an associate engineer at Vertol Aircraft Corporation, Morton, Pennsylvania, with a salary of $110.00 per week.

45. The plaintiff then enrolled as a graduate student at the Drexel Institute of Technology for the purpose of obtaining a Master's Degree in Aeronautical Engineering while he was employed at Vertol. He attended evening classes two nights a week.

46. During his employment at Vertol the plaintiff was regarded by his supervisor as being very capable, conscientious and above average for a recently graduated engineer.

47. Before 1959, the plaintiff enjoyed a normal social life, attended dances and was active in Boy Scout activities. He also participated in athletics and organized a social group which was part of a larger organization known as the Order of Brotherly Love.

48. The plaintiff has never been married and now resides with his mother and sister in his own specially built home in Somerdale, New Jersey.

49. At the time of his entrance into the VA hospital in Baltimore, Maryland, the plaintiff was of a slender, muscular build, but was classified by the VA as 100 percent disabled because of his tuberculosis.

50. It was stipulated by the parties that the plaintiff is completely cured of his tuberculosis.

51. The plaintiff's lost wages from the date of the injury on May 4, 1959, until the date of trial amount to $42,-314.00.

52. The plaintiff has not worked since May 4, 1959. He is unable to sit for long periods of time and must take a nap after four or five hours. He experiences muscle spasms in his legs with swelling and burning sensations in his feet and legs. In addition to these difficulties, he has involuntary bowel movements and occasional urinary accidents due to blockage of his catheter.

53. The plaintiff is embarrassed by these accidents and he has never applied for any type of work.

54. While at the Veterans' Administration Hospital, Bronx, New York, the plaintiff taught high school mathematics to some of the other patients.

55. The plaintiff, who is presently 34 years of age, has a future life expectancy of 40 years provided he gets intensive medical care. Without such intensive care he might not live one year.

56. The uncontradicted evidence in this case compels us to conclude that the plaintiff would have worked for 30 years, but for the injuries he sustained on May 4, 1959.

57. We further find that with the excellent rehabilitative treatment available to the plaintiff he could secure future employment utilizing his scientific training in some related engineering field.

58. Had the plaintiff not been disabled, his salary as an aeronautical engineer would have ranged from a minimum of $10,000.00 in 1964, to a maximum of $18,000.00 during the 1980's, and would have regressed to $14,000.00 by 1995, when he attains the age of 65.

59. The plaintiff is receiving *monthly* disability payments from the VA in the sum of $725.00. Of this amount $200.00 is allotted for special aid and care at home which the plaintiff would lose were he to enter a VA hospital. This means that he receives $525.00 unrelated to any medical expenses. The plaintiff will receive the VA disability benefits for the remainder of his life.

60. Assuming that the plaintiff would work for 30 more years and giving proper consideration to the future disability payments which he will receive from the Government; and assuming further, that the plaintiff will be able to secure some gainful employment in the future, we find that his lost future earning capacity is $6,000.00 annually.

61. This sum reduced to present value at the rate of 3.5 percent is $110,352.00.

62. There is no claim by the plaintiff for past medical expenses since such care was provided by the Government.

63. His future medical treatment will require intensive rehabilitation, evaluations by urologists, neurosurgeons, plastic surgeons, psychiatrists, reconstructive procedures if necessary on contractured feet if they arise, various neurosurgical procedures on his back or in his spinal canal if the reflex spasms in his legs become uncontrollable. He also runs the risk of infection of the bladder and the kidneys and decubitus ulcers.

64. Assuming that the plaintiff will live his projected life span of 40 years, and giving due consideration to the $200.00 monthly allowance which the plaintiff will receive during his entire life outside of a VA hospital, we find that his future medical expense will be $5,000.00 annually making a total sum of $200,000.00.

65. On the issue of pain and suffering, we find that the plaintiff has suffered, is suffering, and will continue to suffer in the future grievous physical and mental distress. He has no hope for any future recovery and he will never regain the use of his lower extremities.

66. In addition to the above problems the plaintiff has become depressed and has suffered the permanent loss of his sex powers. (Ex. P–38 pp. 3 and 24)

67. The plaintiff's sleeping hours are interrupted daily two or three times a night so that he may change his position to prevent bed sores. He must swing his legs from one side of the bed to the other taking care not to tangle the hose of his indwelling catheter.

68. One incident illustrative of the plaintiff's suffering occurred when some friends visited him in the Bronx Hospital. They took him out in the car and he had an unexpected bowel movement. He was taken back to the hospital, suspended by his arms and washed down with a hose.

69. His legs are subject to uncontrollable spasms which can only be corrected by an operation. He has undergone various collateral operations at the VA Hospital, Bronx, New York directly emanating from his present paraplegia.

70. We find that the plaintiff is entitled to a monetary award of $350,000.00 for past and future pain and suffering.

71. The plaintiff has received disability payments from the Government dating from May 4, 1959, until December 15, 1964, totalling $52,455.00. This sum includes a $10,000.00 payment for construction of his home, and a $1,600.00 payment for the purchase of an automobile.

72. We find that the Government is entitled to a deduction of $52,455.00 from the amount of the verdict.

## DISCUSSION

The Government's defense, which we have rejected, is that the paraplegia resulted from an occlusion in one manner or another of the *intercostal artery* which supplies the fundamental source of blood to the spinal cord. Such an event is not foreseeable, because when bleeding occurs in this region it must be stopped or the patient will die. There is

no way to predict from one individual to another as to when this particular blood vessel will occur in the thoracic region.

The Government's expert medical witnesses based their respective opinions upon the fact that it had been reasonably established that this *intercostal artery* was the *source* of the bleeding in the thoracic region. (n. t. 472, 492, 611) Doctor Sharp, the operating surgeon, was the only physician who actually saw the bleeding when it occurred. He described it as *venous* bleeding and noted in his Operation Report that he believed the *intercostal vein* had been bleeding. (Ex. P–3 p. 2) Doctor Kieffer, who assisted Doctor Sharp in the first operation and became the operating surgeon in the exploratory surgery, stated in his Operation Report, that the *intercostal vein* had been bleeding. (Ex. P–4) In a later report, Doctor Kieffer noted that the paralysis may have resulted from a thrombosis of an *intervertebral vein*. (Ex. P–7 p. 2) Doctor Arnold, the neurosurgeon, did not enter the exploratory operation until after the oxycel packing had been removed and he had no personal knowledge of the source of the bleeding. In his Neurological Consultation Report, he makes no mention of a possible occlusion of the *intercostal artery*. The Doctor's Progress Notes and recorded pathology fail to mention the *intercostal artery* as being the source of the bleeding. (Ex. P–6) In fact, the uncontradicted testimony was that the head of the fifth rib obscured the surgeon's vision and made it impossible for him to pinpoint the source of the bleeding.

Doctor Olsen, the plaintiff's expert, testified that an occlusion of the *intercostal vein* would not cause a thrombosis since the vein did not supply the main source of blood supply to the spinal cord. (n. t. 200)

The Government's position is not supported by the evidence.

In an action brought under the Federal Tort Claims Act, the Federal Court must apply the state law of the place where the act or omission occurred. Since the negligence and injury occurred simultaneously in Maryland, we must apply Maryland law. Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L. Ed.2d 492 (1961) According to Maryland law there is a presumption that a surgeon has performed his work with reasonable care and skill. Negligence must be affirmatively established by the plaintiff. Fink v. Steele, 166 Md. 354, 171 A. 49 (1934) The plaintiff is required to show a lack of care or skill, as well as a causal relationship between that and the injury. If either of these elements is lacking then the case cannot be submitted to the jury. Suburban Hospital Association, Inc. v. Mewhinney, 230 Md. 480, 187 A.2d 671 (1963) The degree of care, skill and diligence required is not the highest or greatest, but only such as is ordinarily exercised by others in the profession generally in that area. Lane v. Calvert, 215 Md. 457, 138 A.2d 902 (1958). The doctrine of res ipsa loquitur does not apply. Lane v. Calvert, id.

The plaintiff has established, through expert testimony, as he was required, that his paraplegia was caused by a piece of oxycel gauze stuffed into his spinal canal through the intervertebral foramen. The plaintiff's expert gave his opinion that this occurrence was not in accord with proper and acceptable medical standards. The fact that Doctor Olsen was not a surgeon from Baltimore, Maryland, and was not familiar with the surgical standards prevailing in Baltimore in 1959, did not automatically disqualify his opinion. He is a highly qualified surgeon, and is Chief of Neurosurgery at Hahnemann Medical College and Hospital, two other Philadelphia hospitals, and he is a consultant at the Veterans' Administration Hospital, and the United States Naval Hospital in Philadelphia. All of his training and experience were gained in metropolitan centers

such as Chicago, Boston and Philadelphia. It is a commonly known fact that the standards of medical practice in large urban hospitals located in cities such as Boston, Philadelphia and Baltimore are higher than the standards in less populated localities. The sufficiency and weight to be given to Doctor Olsen's testimony was a question to be determined under the local law of the forum. Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908, 917 (3 Cir. 1948). Also see Dill v. Scuka, D.C., 175 F.Supp. 26 rev'd 279 F.2d 145 (3 Cir. 1960) where two medical experts from Washington D.C. and Philadelphia were permitted to testify for the plaintiff in a Kansas malpractice case. On appeal the Court of Appeals held that the plaintiff's expert testimony was sufficient to go to the jury.

We fail to see how there could be any substantial variance between the proper surgical standards in two sophisticated eastern cities such as Philadelphia and Baltimore which are less than 110 miles apart. Also, when Doctor Olsen was questioned regarding his qualifications the Government conceded that he was qualified to testify. (n. t. 126) It was only after the testimony had reached the point of the hypothetical question that the Government objected. (n. t. 162, 163, 164)

■ It was later developed through Doctor Kieffer that in his opinion he could not think of any difference in the ordinary care of a patient in Maryland or Pennsylvania. (n. t. 342) Doctor Olsen's opinion received unexpected support from Doctor Ravitch, the defendant's medical expert from Baltimore, who said it would be "improper" to stuff oxycel gauze into the intervertebral foramen. (n. t. 620) Doctor Ravitch further testified that under no circumstances could a Kittner Dissector be admitted to this area. (n. t. 630, 631) The uncontradicted testimony of Doctor Sharp, the operating surgeon, was that he had used the Kittner Dissector in the area of the bleeding which was near the intervertebral foramen, and he applied light pressure in using the device. (n. t. 397) Doctor Sharp further testified that the most likely cause of the plaintiff's injury was damage to the cord. (n. t. 425) He reached this conclusion because he had used cauterization to stop the bleeding and because there were manipulations around the posterior rib. (n. t. 425) Doctor Kieffer had testified that it was not advisable to use cauterization or clamps in this area because of fear of injury to the spinal cord and the nerve tissue. (n. t. 332, 333) When the oxycel packing was removed by Doctor Kieffer he saw spinal fluid escaping through the intervertebral foramen. Also, a tear in the dura caused spinal fluid to escape freely. All of these facts in conjunction with the expert testimony lead us to the conclusion that the operation was performed in a negligent manner and such negligence was the proximate cause of the plaintiff's paraplegia.

On the question of damages we have specifically set forth in our findings each category of damages. We made our decision with the primary intention of awarding the plaintiff just *compensation.* While this is a tragic case we have not been influenced by sympathy in this regard.

■ We have followed the instructions of the United States Supreme Court in Brooks v. United States, 337 U.S. 49, 53, 69 S.Ct. 918, 921, 93 L.Ed. 1200 (1949) which stated that the amount payable under servicemen's benefit laws should be deducted " * * * *or taken into consideration,* when the serviceman obtains judgment under the Tort Claims Act." [1] (emphasis supplied) It is only

---

1. See Snyder v. United States, (5 cases) 118 F.Supp. 585, (D.Md.1953); modified in part aff'd in part 4 Cir., 218 F.2d 266; rev'd and judgment of District Court reinstated, per curiam, 350 U.S. 906, 76 S.Ct. 191, 100 L.Ed. 796 (1955) where the District Court took into account prospective future disability payments in reaching its verdict.

fair that this result should follow since the United States, as any other defendant, should not have to pay twice for the same injury. We have deducted the past disability payments because these sums have already been paid. With regard to the plaintiff's loss of future earning capacity, we have considered his present physical condition and prospects for future improvement through rehabilitation. We believe that with proper management and rehabilitation the plaintiff's scientific training will make it possible for him to secure employment in the future. This Court has personal knowledge of the improvements that can be effected through the diligent use of rehabilitative techniques available to paraplegics. In the unreported case of Hutton, Guardian of the Estate of Eddie Graybeal, *a minor* v. Fisher, C.A. No. 28261 (E.D.Pa.1963) a sixteen year-old boy who is a paraplegic, was trained to the degree that he can take care of all his needs. He has managed through operations and training to control his bowel and bladder movements. Also, he has learned the trades of a watchmaker and optician. In addition to these occupational improvements, he participates in wheelchair races and basketball games in New York City. He has also appeared on television and promoted National Hire the Handicapped Week. The law does not expect that such heroic determination will be exhibited by *all* plaintiffs and the defendant must accept the present plaintiff as it finds him.

While some hope for future rehabilitation does exist we do find that the plaintiff has established a diminution of earning capacity. He has shown by his past employment record and his pursuit of an advanced engineering degree that he is an industrious, capable person. The record shows that aeronautical engineers entering the field today could command an entrance salary of $7,600.00. The future prospects, assuming no serious national economic recessions or depressions, are very favorable with a high salary of $18,000.00 during the 1980's. This salary range gives no consideration to the possible management promotions which a superior engineer could attain.

In making our award, we balanced such factors as the plaintiff's proven earning ability, his prospects for some future employment, against his VA monthly disability benefits of $525.00 (unrelated to any medical expenses) and reached the conclusion that his future earning capacity has been reduced by $6,000.00 annually. We also found as a fact, that, but for his disability the plaintiff would have worked for thirty additional years. Thus, his loss of future earning capacity at $6,000.00 per year reduced to present value at the rate of 3.5 percent [2] is $110,352.00.

We reject the Government's argument that the law of the forum should be applied to reduce the damages to present worth.[3] In Pennsylvania the discount figure is 6 percent. Brodie v. Philadelphia Transportation Company, 415 Pa. 296, 203 A.2d 657 (1964). The United States argues that since the Maryland cases are silent on the conflict of laws question, the Maryland law is that the general law should be applied. Herr v.

---

2. Maryland has no rigid rule as to the discount rate to be applied in reducing damages to present value. See, Snyder v. United States, (5 cases) supra note 1 (3.5 percent); Jennings v. United States, D.C., 178 F.Supp. 516 (4 percent); vacated and remanded on other grounds 291 F.2d 880 (4 Cir. 1961); judgments reinstated D.C., 207 F.Supp. 143; aff'd per curiam 318 F.2d 718 (4 Cir. 1963). Inquiry was made by this Court to the District Court for Maryland and it was learned that 3.5 percent is within the current range of discount values now being applied by that Court.

3. We also reject the Government's argument that projected income taxes should be deducted in computing lost future earning capacity. We know of no precedent in Maryland or Pennsylvania which *absolutely requires* such a deduction. In fact, it is against the general weight of authority. Annotation: "Propriety of taking income tax into consideration in fixing damages in personal injury or death action." 63 A.L.R.2d 1393.

Holohan, 131 F.Supp. 777 (D.C.Md.1955) The new, flexible conflict of laws concept, recently adopted by Pennsylvania in Griffith v. United Air Lines, Inc., 416 Pa. 1, 15, 203 A.2d 796 (1964) is to apply the law of the state having the most significant relationship with the occurrence and the parties. This principle was recognized by the United States Supreme Court in Richards v. United States supra pp. 12, 13, 82 S.Ct. 585, 7 L.Ed.2d 492.

Under Griffith, the contacts test considers as vital, the place of the injury, place of conduct, domicil of the parties and the place where the relationship between the parties is centered. Also, under § 379(a) of the new Restatement,

> "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved, in which event the local law of the latter state will govern."

Applying this test to the instant case, we find that the place of the conduct and injury as well as the relationship between the parties are all centered in Maryland. The plaintiff's domicil is in doubt. When suit was filed in May, 1961, he was living with a quadraplegic in a home in Fort Lauderdale, Florida to avoid the cold weather. The complaint only speaks of the plaintiff's *residence* as being in Pennsylvania and not his *citizenship*. When the plaintiff returned to this area in July, 1961, he has since resided continuously in New Jersey. Initially, he lived with his sister and brother-in-law from July, 1961, until November, 1964, when shortly before trial he purchased his own home in Somerdale, New Jersey.

 We conclude that Maryland has the most significant relationship between the parties and its law controls the amount of damages to be awarded the plaintiff.

 In determining the plaintiff's future medical expenses, it is impossible to award a figure with any absolute certainty.

> "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, *it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.* The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. [cases cited] As the Supreme Court of Michigan has forcefully declared, *the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.* [case cited]" Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (emphasis supplied)

The plaintiff has proved his present and future need for constant, unremitting and highly intensive care from almost every medical specialty known to man. There is sufficient evidence in the record to warrant an annual expense of $5,000.00 for his projected life expectancy of 40 years.

In reaching this figure we have considered the fact that he will receive, for the rest of his life, $200.00 monthly from the VA for aid and attendance at home. It matters not that the plaintiff has looked to the VA hospitals for all of his medical needs in the past. He has a right to select a private hospital or physician of his own choosing should he so desire in

the future. Feeley v. United States, 337 F.2d 924 (3 Cir. 1964)

■ The last and most distressing element of damages concerns the plaintiff's pain and suffering. We have no desire to engage in the macabre by detailing every gruesome aspect of the plaintiff's considerable suffering. However, we find it difficult, if not impossible, to assess the loss of such fundamental ordinary human functions as the ability to stand, walk, run and eliminate. He has lost the ability to procreate and he will never know the pleasures and satisfactions of marriage and parenthood. He has a life that offers little in the way of optimism for the future. The disfigurement, humiliation and anxiety he has undergone is considerable. He is paralyzed from his chest down to his legs which are subject to uncontrollable spasms. This man's condition will only become increasingly more distressing with advancing years. We believe that $350,000.00 is just and reasonable compensation under the circumstances of this case.

■ The plaintiff objects to our deduction of past disability payments because the plaintiff already had a 100 percent disability rating before the injury of May 4, 1959. He further objects to our considering future VA disability payments in making our award. It was stipulated that the plaintiff was cured of his tuberculosis following the operation of May 4, 1959. Therefore, his only 100 percent disability rating can be attributed to the injuries sustained by the operation of May 4, 1959. All amounts paid since that date are the only sums sought by the United States and we find that such deductions are proper. Brooks v. United States, supra.

■ His contention as to our considering future VA payments is based on the Veterans' Benefits Act 38 U.S.C.A. § 351 which provides for the suspension of future benefits by the VA for any month following a judgment under the Tort Claims Act "until the aggregate amount of benefits which would be paid but for this sentence equals the total amount *included* in such judgment * * *." We find nothing in this Act or its legislative history [4] which indicates that Congress intended that the District Court was preempted from making a judicial determination of *just compensation* in rendering a judgment under the Tort Claims Act. The Act merely gives the VA the right to make a policy determination in each individual case to grant or withhold benefits when similar amounts are "included" in a judgment under the Tort Claims Act. We emphasize the fact that in making our award proper weight was given to the possible future VA benefits accruing to the plaintiff and our judgment was reduced accordingly. Certainly pain and suffering has no bearing on what disability rating a Veteran will receive and could not be construed to be a duplication of benefits.

Finally, four weeks after trial on January 22, 1965, the Government has filed a motion for leave to amend its Answer. The Amended Answer seeks to deny jurisdiction in this Court under 28 U.S.C.A. §§ 1346(b) and 1402(b).[5] Also, the United States now claims 28 U.S.C.A. § 2680 precludes liability because the Government cannot be responsible for lack of due care in the exercise of a *discretionary function.* We find no merit in any of these allegations and the motion is denied. The Government claims that it first learned of the plaintiff's Florida

---

4. 1962 U.S.Code and Congressional and Administrative News p. 3260.

"Also, duplicate recoveries from the United States for the same disability or death under section 351 and the Federal Tort Claims Act would be precluded by providing a setoff against compensation benefits of the amount of any recovery pursuant to a civil judgment, settlement, or compromise."

5. Subsequent to this motion the United States has filed another motion to amend its prior motion for leave to amend its answer denying venue and jurisdiction. Now, the Government seeks to admit these allegations. In all other respects its motion to amend remains intact.

residence at the time of trial. This is contrary to the record. In Answers To Defendant's Interrogatories (Document No. 8) filed August 27, 1962, the plaintiff specifically informed the Government that he was living in Florida from December, 1960 until July, 1961. Also, by prior stipulation of counsel the United States agreed not to object on grounds of jurisdiction or *venue* and the plaintiff withdrew his action previously instituted in the District Court for Maryland.

 Jurisdiction is unquestionably in this Court under § 1346(b). Venue under § 1402(b) may have been defective, but the United States has waived any defects in such venue by failing to make timely objection. Hoiness v. United States, 335 U.S. 297, 69 S.Ct. 70, 93 L.Ed. 16 (1948) 28 U.S.C.A. § 1406(b).

On the theory of liability that the United States failed to warn the plaintiff of the danger of paraplegia, our Finding No. 40 makes it unnecessary for the United States to amend its Answer to meet this amended claim of the plaintiff.

## CONCLUSIONS OF LAW

1. Jurisdiction and Venue are properly in this Court.

2. The operation of May 4, 1959, was performed in a negligent manner by a physician who was an agent or employee of the United States acting within the scope of his employment.

3. Such negligence was the proximate cause of the plaintiff's permanent injuries.

4. The plaintiff is entitled to damages in the following amounts:

| | |
|---|---|
| Past Income | $ 42,314.00 |
| Loss of Future Earning Capacity | 110,352.00 |
| Future Medical Expense | 200,000.00 |
| Pain and Suffering | 350,000.00 |
| Gross Damages | $702,666.00 |

5. The United States is entitled to a deduction of past disability payments totaling: $52,455.00.

6. The plaintiff is entitled to a verdict in the sum of $650,211.00.

7. The plaintiff failed to prove that the Government's failure to warn was negligence.

8. Judgment will be entered on the verdict.